CAROLINE LANDWEHR, Executrix of the Estate of FRITZ LANDWEHR, Appellant, v. O. H. MOBERLY, State Finance Commissioner In Charge of FARMERS & MERCHANTS BANK, a Delinquent Corporation.—93 S. W. (2d) 935.

Division One, April 23, 1936.

B. B. Baxter and Orla M. Hill for appellant.

*Joseph T. Tate* and *James Booth* for respondent.

COLLET, J.—On August 15, 1932, the Board of Directors of the Farmers & Merchants Bank of Owensville decided to close that bank and notified the Commissioner of Finance to that effect. That officer took charge of the bank on the following day. At the time the bank closed Carolyn Landwehr, executrix of the estate of her deceased husband, had $18,039.68 belonging to the estate on deposit in her representative capacity. This sum represented a number of deposits dating from November 9, 1931, until August 12, 1932, less certain withdrawals within that period. She claims a preference for the entire amount of the deposit. The petition bases this claim upon two grounds, (1) that the deposits as made were special deposits and, (2) that at the time the deposits were received the bank was known by its officers to be in a failing condition thereby making the receipt of the deposits fraudulent and creating a trust in favor of plaintiff. The defendant is the Commissioner of Finance who is in charge of the assets of the bank for the purpose of liquidation. It is conceded that sufficient assets exist for the payment of the claim. The facts germane to each of the above questions follow.

The only evidence offered by the plaintiff in support of her claim that the deposits were special consisted of the testimony of her son Julius C. Landwehr, who was with her at the time of the making of the first deposit on November 9, 1931. On this point he said:

"I recall going with my mother to the Farmers' and Merchants' Bank about November 9, 1931. At the bank we saw Mr. E. W. Steinbeck, cashier of the bank. A conversation transpired with Mr. Steinbeck. My mother got a check for $600 from Mr. W. J. Diestelkamp of Hinkle, Missouri and Mr. Steinbeck says: 'How would you have this?' I says: 'We were caught over at the Owensville Bank with some of the funds the other day and we wouldn't like to be caught again.' I says: 'Is there any chance to place this money here to be safely kept for us?' He says: 'Yes, sir, it will be absolutely safe, ready any time you want it. As far as this bank being forced into liquidation, it is absolutely out of the question. It can't be done. If the depositors want their money, they can get it. In that condition this bank is.' And upon that statement the deposit was made."

He further stated that at the time of the above conversation there was discussion relative to the estate of his father and it was made clear that the deposit then made and such deposits as might be made belonged to the estate and were being deposited for safe keeping until distribution was to be made. In that connection the court made the following inquiry:

"Q. The conversation you had with Mr. Steinbeck about depositing this money; was he to keep this money and turn it over to you in kind, or was he to pay you out of the assets of the bank when the time came? A. There was nothing said particularly about it, but it was understood it was to be kept for safe keeping.

"Q. And not put in the assets of the bank at all? A. That part particularly wasn't mentioned, the assets.

"Q. But it was your understanding he was to keep the money there and when she came and called for the money he was to turn it over to her? A. Yes, sir.

"Q. And it was not to be paid out of the assets of the bank? A. Yes, sir, that is right."

On cross-examination the witness identified several of the checks representing the withdrawals above referred to and further stated:

"If there had been more debts out against the estate or any more taxes to pay, I expect it would have been handled in the same way. It was my understanding that the bank was to honor these checks when presented against this account, that is the understanding I had with the bank. If they were properly drawn and signed by her they were to pay them, regardless of who they went to, out of her account. That is the understanding I had with the bank."

The plaintiff had an individual account at the bank upon which she wrote checks. That account was in no manner mingled with the affairs of the estate.

Mr. Steinbeck, the cashier, testifying for the defendant stated that he did not recall the conversation related by the witness Julius Landwehr, but he was sure that he did not agree with Landwehr and his mother that the deposits would be taken as a special deposit; that the deposits constituted a checking account, received in the customary manner. He said that he might have informed Landwehr that the bank was meeting all claims as he made that statement to numerous people and hence probably made it on this occasion. It appears from the record that another bank in Owensville had failed shortly before the first deposit was made November 9, 1931.

Upon the question of the alleged fraud in accepting the deposits at a time when the bank was in an insolvent condition, plaintiff called as a witness Mr. Aufderheide, president of the bank during the period involved. He stated that during the year and a half or two years before the bank closed the board of directors of the bank kept

in touch with the Commissioner of Finance regarding the bank's affairs and that several conferences, the number of which were not given, were had with the Commissioner of Finance during that period of time concerning the condition of the bank. Apparently Aufderheide, Steinbeck, the cashier, and Berger, the assistant cashier, represented the bank at the conferences with the commissioner. Aufderheide stated that in the latter part of 1931 slightly excessive withdrawals commenced; that the excessive withdrawals gradually became heavier until on August 12, 1932, he, in company with other officials of the bank, went to Jefferson City and discussed the entire situation with the Commissioner of Finance. The conference resulted in the commissioner advising them to wait a few days before doing anything and if, during that time, the excessive withdrawals continued, the only thing to do was to close the bank. The excessive withdrawals continued and on the night of August 15, 1932, a meeting of the board of directors was called, the situation canvassed, and the conclusion reached, to close the bank. Aufderheide further testified that because of the fact that it was impossible to collect on loans due the bank fast enough to provide sufficient cash with which to meet the increasing withdrawals, several loans were procured from the First National Bank of St. Louis during the period from December, 1931, to August, 1932. Certain of the assets of the bank consisting of bonds and real estate loans were pledged with the First National Bank to secure these loans. It is impossible to determine from the abstract of the record the exact date and amount of these loans. Examined on the question of the value of the assets Aufderheide stated that the bond account was the chief source of worry to the officials of the bank—that the bonds had depreciated in value to such an extent that on November 9, 1931, these assets were worth approximately $50,000 less than their total face value, although some were in default. He said that it became necessary for the bank to take over some real estate, a part of which was worth less and part of it more than the amount of the loans for which it was taken. On all dates involved the capital stock of the bank was $30,000, and the surplus $26,000.

W. E. Hannemann, one of the directors, called as a witness for plaintiff, testified that on July 15, 1932, he made a time deposit at the bank for his brother for $2800, which amount was still on deposit at the time the bank closed. He further testified that on June 16, 1932, a time deposit at the bank in his favor for $2300 matured; that he added $400 to it and deposited the entire amount of $2700 on June 16, 1932, which amount was likewise on deposit at the time the bank closed.

Henry Kramme, another director, called by the defendant, testified that he and his relatives had money on deposit with the bank when

it closed. He stated that the reason for the closing of the bank was the continued, steady and excessive withdrawals.

Julius Landwehr testified that he and his mother were solicited by Mr. Steinbeck to open the account and that apparently he was anxious that it should not be withdrawn; that some time after the account had been opened, two time-certificates belonging to the estate matured which the witness thought should be cashed in order that the money be available for partial distribution, however, at the suggestion of Mr. Steinbeck they were renewed at four per cent interest, although the bank's rule permitted the payment of only three per cent. These certificates were cashed in April, 1931, and the interest at four per cent paid on them. This witness further testified that on several occasions assurances were made to him and his mother by officers of the bank that the bank was solvent, the last of the occasions being in July, 1932.

An effort was made soon after the bank closed to effect a reorganization by having the depositors waive fifty per cent of the total deposits. The plan contemplated, in effect, charging off the bonds and real estate loans and was initiated by the Commissioner of Finance. It was not carried out.

The trial court entered a judgment disallowing the preference but allowing the claim as a common claim. From that judgment plaintiff appealed.

■ The rule of law applied in determining whether a bank deposit is "special" or "general" as those terms are used in cases of this character, is stated in the case of City of Fulton v. Harrison (Mo. App.), 69 S. W. (2d) 312, l. c. 315, 316, as follows:

"The presumption is that a deposit is a general one and the burden of proving otherwise is on the person claiming priority as a special depositor. A special deposit in its truest sense is one where the bank merely assumes custody and charge of the property without authority to use it, and the depositor is entitled to receive back the identical thing deposited. The title to the thing deposited remains with the depositor and, as a general rule, if the special deposit be money the bank has no right to mingle it with its other funds. However, the rule has been greatly relaxed so that, where the money deposited is to be used for a specifically designated purpose, it may still be regarded as a special one, even though the funds were deposited under an agreement allowing them to become mingled with other funds in the bank and they are so mingled that the identical money deposited can no longer be identified. However, that purpose must be evidenced by a mutual understanding or agreement on the part of the depositor and the bank and the intention or purpose, merely on the part of the depositor, that it should become a special deposit is not sufficient to make it so. [In re North Mo.

Trust Co. of Mexico, Mo. (Mo. App.), 39 S. W. (2d) 412; Fred A. Boswell Post of the American Legion v. Farmers' State Bank of Mt. Vernon (Mo. App.), 61 S. W. (2d) 761, 762; Craig v. Bank of Granby, 210 Mo. App. 334, 238 S. W. 507.]''

The above-cited case was transferred to this court where the rule quoted above was approved. [City of Fulton v. Home Trust Co., 336 Mo. 239, 78 S. W. (2d) 445.] Applying that rule to the facts in this case it is clear that no special deposit was established. Reverting to Landwehr's testimony,—he says that the cashier of the bank told him and his mother that the money would be absolutely safe and would be ready for them any day they wanted it; that the bank could not be forced into liquidation and if the depositors wanted their money they could get it; that thereafter a number of checks were drawn against the account in payment of minor debts and current expenses of the administration of the estate; that if there had been more of those debts they would have been paid in the same manner by checks on this account without further arrangement with the bank. Viewed in its most favorable light to plaintiff this testimony merely indicates that plaintiff may have had in mind some sort of a deposit other than the ordinary or general deposit, but it wholly fails to show any understanding or agreement on the part of the officials of the bank that the initial deposit or any of the others were received as special deposits within the meaning of that term as defined in the above quoted rule. Hence, the so-called ''pay roll'' cases, such as the case of Central Coal & Coke Co. v. State Bank of Bevier, 226 Mo. App. 594, 44 S. W. (2d) 188, are not applicable. Neither would the fact that the officials of the bank knew that the funds deposited by plaintiff were held by her in trust for the estate of which she was executrix render such deposits ''special.'' Deposits made by trustees or executors of funds entrusted to their care are not ''special deposits'' merely because they are to be used only for the purpose of carrying out the purpose of the trust. [Compton v. Farmers' Trust Co. (Mo. App.), 279 S. W. 746; Mo. Mutual Assn. v. Holland Banking Co., 220 Mo. App. 1256, 290 S. W. 100; Paul v. Draper, 158 Mo. 197, 59 S. W. 77.]

Neither does the evidence justify a finding that the receipt of the deposits was fraudulent upon the ground that the bank officials knew the bank was insolvent at the time of the deposit. Without reviewing in further detail the testimony in this regard, it is sufficient to observe that the great weight of the evidence indicated that the closing of the bank resulted from a persistent, gradual withdrawal of the deposits of the bank extending over a period of almost a year. There was no suggestion of mismanagement or dishonesty. While the withdrawal of deposits did not change the comparative ratio which the assets bore to the liabilities, it does appear that those withdrawals compelled the sale of the more liquid assets to pro-

cure cash with the result that the depreciated bond account then constituted a greater per cent of the total assets than before. Although the evidence fails to indicate to what extent the liquidation of the better securities may have changed the total value of the remaining assets, yet in view of the testimony of plaintiff's witness Aufderheide that the impairment in the value of the assets of the bank consisted almost entirely in the depreciation of the value of the bonds owned by the bank, apparently any depreciation in the total value of the remaining assets caused by the sale of the better securities was included in the depreciation of the bond account. The amount of the depreciation was fixed by him at somewhat less than $50,000. The amount of the capital stock and surplus as above related was $56,000. Since the capital stock and surplus are not considered as debts of the bank in determining its solvency (State ex rel. v. Cox, 327 Mo. 790, 38 S. W. (2d) 1079), the capital stock and surplus was sufficient to absorb the depreciation in value of the bonds. From the fact that at the time the bank closed several of the officers of the bank had on deposit substantial amounts which had deposited shortly before the bank closed, it is to be inferred that they did not consider the bank insolvent. Neither does it appear that the Commissioner of Finance considered the bank insolvent. The bank was examined by his representatives, the bank officials discussed the affairs of the bank, including the bond account, with him and yet on August 12, 1932, three days before the bank was closed, he advised the continued operation of the bank. Finally, when it was closed it was the result of the voluntary action of the bank's board of directors. Plaintiff's proof failed to sustain the burden of showing the existence of the fraud charged.

The judgment should be affirmed. It is so ordered. All concur.