KILLOREN v. FIRST NAT. BANK IN
ST. LOUIS.

No. 12161.

Circuit Court of Appeals, Eighth Circuit.

May 4, 1942.

Rehearing Denied June 1, 1942.

Vincent L. Boisaubin, of St. Louis, Mo. (Joseph H. Grand and Jones, Hocker, Gladney & Grand, all of St. Louis, Mo., on the brief), for appellant.

Thomas S. McPheeters, of St. Louis, Mo. (Bryan, Williams, Cave & McPheeters, of St. Louis, Mo., on the brief), for appellee.

Before GARDNER, THOMAS, and RIDDICK, Circuit Judges.

GARDNER, Circuit Judge.

This was a suit in equity brought by the trustee in bankruptcy of the Hamilton-Brown Shoe Company to impress a trust upon the funds of the bankrupt in the hands of the First National Bank in St. Louis, in

the sum of $19,704.87. Appellant was plaintiff and appellee was defendant in the court below, and we shall so designate them here.

Plaintiff alleged that on April 14, 1939, the Hamilton-Brown Shoe Company, while insolvent, deposited in its account with defendant the sum of $27,272.12, of which the sum of $25,958.16 represented the proceeds of a loan obtained by the bankrupt from Commercial Factors Corporation, for the specific purpose of enabling the bankrupt to pay the wages of various employees earned during the period of approximately two weeks prior to April 14, 1939; that the deposit was made as a special deposit and not in the ordinary course of business, and that defendant had knowledge that it was made for the specific purpose of meeting the Shoe Company's next pay-roll; that on April 17, 1939, the defendant applied the balance of the amount—$19,704.87—on the Shoe Company's indebtedness to the bank.

The defendant answered, denying that there was ever any agreement or understanding, either express or implied between the bank and any representative of the Shoe Company, or any representative of Commercial Factors Corporation, that any deposits made or to be made with defendant bank were to be used only to meet the Shoe Company's pay-roll, or for any other specific purpose, but that all deposits made by the Shoe Company, including the one in question, were made in the company's regular checking account and were at no time earmarked or designated as a special deposit, but this checking account was subject to the Shoe Company's check drawn in the regular course of business for any purpose whatever.

The court determined the issues in favor of the defendant and made findings of fact and conclusions of law accordingly. From the decree dismissing plaintiff's complaint this appeal is perfected.

In seeking reversal, plaintiff contends: (1) that the bank had no right of set-off because it knew, or by reasonable investigation could have ascertained, the purpose of the deposit; (2) that the bank had no right of set-off even though without knowledge that another than the depositor had an interest in funds deposited in its name, where such lack of knowledge has not resulted in any change of the bank's position and no superior equities have been raised in its favor; (3) that the right of set-off should not be allowed because to do so would give the bank a preferential advantage over other creditors.

It appears from the findings or the undisputed evidence, that prior to bankruptcy Hamilton-Brown Shoe Company, with offices in St. Louis, Missouri, operated shoe factories at Union and Poplar Bluff, Missouri. On April 17, 1939, it filed a petition for reorganization under the Bankruptcy Act, and thereafter plaintiff was elected its trustee in bankruptcy. For some time prior to April 13, 1939, the Shoe Company had two deposit accounts with defendant bank. One was its regular checking account used for all checking purposes, and the other was a pay-roll account used only for the purpose of meeting its St. Louis pay-roll. This pay-roll account is not in any way here involved. At the close of business on Thursday, April 13, 1939, the Shoe Company had on deposit in its checking account the sum of $3,669.32. On April 14, 1939, it deposited in this account the sum of $27,272.12, included in which was a cashier's check of the Mercantile Commerce Bank and Trust Company in the amount of $25,958.16, drawn to the order of the Shoe Company and endorsed by it for deposit in the regular way. On the same date, checks drawn by the Shoe Company in the regular course of its business against the account were presented to the bank for payment through the clearing house, or over the counter, and were paid in the sum of $9,169.39, so that at the close of business on Friday, April 14, 1939, there was on deposit in the checking account the sum of $21,772.45. On the following Saturday, April 15, 1939, there were deposits made in the checking account totaling $774.97 and checks were drawn on that account in the total sum of $3,523.83 and were paid, so that at the close of business on Saturday, April 15, 1939, there was a total on deposit in this account of $19,023.59. On Monday, April 17, 1939, deposits amounting to $852.38 were made in the account and two checks were paid over the counter, totaling $171.10, so that there was a balance in the account after these checks were paid, of $19,704.87. Later on the same day, checks were presented to the bank through the clearing house in the aggregate amount of $28,550.92, one of them, in the amount of $4,758.85, being drawn to the order of the Bank of Poplar Bluff, Poplar Bluff, Missouri, and another, in the amount of $21,752.43, being drawn to the order of the United Bank of Union, Union, Missouri. As the checks presented amount-

ed in the aggregate to more than the amount on deposit, the bank refused payment and returned them to the clearing house. The Shoe Company was indebted to the bank in a sum greatly in excess of the amount remaining on deposit, and at the close of business on that day the bank applied the deposit of $19,704.87 in reduction of the amount owing it by the Shoe Company.

For several months prior to April 14, 1939, Commercial Factors Corporation had been financing the Shoe Company by making loans to it against the pledge of its accounts receivable. A representative of Commercial Factors Corporation and the president of the defendant bank, on Thursday, April 13, 1939, had some conversation relative to whether the Shoe Company would be able to meet its pay-rolls at Union and Poplar Bluff. The court found that there was no agreement between the defendant bank and the representative of Commercial Factors Corporation, or any representative of the Shoe Company, that the check of $25,958.16, or any other check or amount, was to be treated as a special deposit or used only for the purpose of meeting such pay-rolls, but that said check was delivered by Commercial Factors Corporation to the Shoe Company and deposited by the Shoe Company in the regular way in the Shoe Company's regular checking account, with no agreement or understanding, express or implied, that the amount of such check or the other checks deposited on the same day was to be allocated or set aside for any special purpose; that the check of $25,958.16 was several hundred dollars short of being sufficient in amount to meet the pay-rolls due April 15; that the Shoe Company was at all times mentioned transacting its regular business, making deposits in its checking account in the regular way, drawing checks against such account for the payment of salesmen's salaries and commissions, accounts payable, and other ordinary expenses of operation; that neither at the time the check for $25,958.16 was deposited, nor at any time prior or subsequent thereto, had any representative of the Shoe Company said anything to any officer of defendant bank, or done anything to indicate that the amount of such check was to be treated in any special way, or that the deposit so made was not subject to be drawn against by the Shoe Company in the regular course of business.

It appears from the undisputed evidence that it was the practice of the Shoe Company to send to the bank at Poplar Bluff and the bank at Union, a "master" check, so-called, for the amount of its bi-weekly pay-roll. This was made payable to the order of the bank to be deposited to the credit of the Shoe Company. The Shoe Company issued to its employees their pay checks drawn on the two banks named. The two checks described in the findings were pay-roll checks or master checks, sent to take care of the April 15 pay-roll. When the deposit of $27,272.12, which included the $25,958.16 borrowed by the Shoe Company from Commercial Factors Corporation, was made, a general deposit slip was used, nothing being written on it or in connection with it to show that the deposit was special or other than a general deposit. The court concluded that plaintiff had failed to establish that the deposit was made for the specific purpose of meeting the pay-roll, or was allocated or set aside as a special deposit or trust fund, and that the bank was entitled to assert its right of set-off.

No question is raised with reference to the jurisdiction of the court. We assume jurisdiction is asserted under Section 23, sub. b of the Bankruptcy Act, 11 U.S.C.A. § 46, sub. b. See Schumacher v. Beeler, 293 U.S. 367, 55 S.Ct. 230, 79 L.Ed. 433.

The findings of the trial court are presumptively correct and should not be disturbed unless clearly erroneous. Federal Rules of Civil Procedure, rule 52, 28 U.S.C.A. following section 723c; F. W. Fitch Co. v. Camille, Inc., 8 Cir., 106 F.2d 635; Storley v. Armour & Co., 8 Cir., 107 F.2d 499; Esso, Inc., v. Standard Oil Co., 8 Cir., 98 F.2d 1. The deposit account of the Shoe Company was its property and not the property of Commercial Factors Corporation, and any binding agreement for the disposition of the funds deposited to that account must be traced to the action of the Shoe Company. Any agreement between the defendant and Commercial Factors Corporation relative to this account would certainly not be binding as against the Shoe Company. On this question the court found that while there was some conversation between the representative of Commercial Factors Corporation and the president of the defendant bank with reference to whether the Shoe Company would be able to meet its pay-rolls, there was no

agreement between defendant bank and the representative of Commercial Factors Corporation, or any representative of the Shoe Company, that any part of the funds deposited should be treated as a special deposit. The court's finding which is supported by abundant evidence, negatives any purpose of the Shoe Company to make the deposit responsive to any certain demand. It was unrestricted and unlimited as any other general deposit. This is made clear by the testimony.

Thus, Walter J. Koechlein, assistant vice-president of Commercial Factors Corporation, testified that on Thursday morning, April 13, 1939, he had a conversation with Mr. Smith, president of the bank, Mr. Kerr, vice-president of the bank, and Mr. Hickok, president of the Manchester Bank, which had some interest in the bank's loans to the Shoe Company. At that time the Shoe Company owed the bank over $98,000. Mr. Koechlein, testifying as a witness for plaintiff, said that Mr. Smith asked him what they would do in the way of taking care of the pay-roll which was maturing on April 15, to which he replied that he would check over sales for the few previous days to see whether they could make any advances. He returned to the office of the Shoe Company, checked over sales of a day or two previous, and said, "I found that we could take care of that pay-roll"; that there were sales of about $25,000, and he wired New York for a check which was received the following morning in the sum of $25,958.-16, and the check was turned over to the Shoe Company and deposited in the defendant bank. Mr. Koechlein also testified, "That was Thursday morning. I called Mr. Smith at the First National. He was not at his desk. I talked with Mr. Kerr and told Mr. Kerr that we had been able to take care of the payroll check, and I wished he would tell Mr. Smith, which he said he would be glad to do." He also testified that he had discussions with Mr. Collins or Mr. Morris of the Shoe Company, in which it was stated that sales were lagging very much, and it was a problem to raise the pay-roll for the week-end requirements, and that the Shoe Company needed about $8,500 to $10,000 additional money to take care of salesmen's drawing accounts, commissions, etc. Concerning the check for $25,958.16, he testified on cross-examination that, "It was to cover the pay-roll and any other requirements that they had," and in answer to the question, "That amount was to be available to the Hamilton-Brown Shoe Company for the pay-roll, meeting current obligations, or any other purpose of the Hamilton-Brown Shoe Company?" He answered, "Yes, sir."

Mr. Smith testified relative to this meeting, to the effect that the general condition of the Hamilton-Brown Shoe Company was discussed, and the fact that increasing complaints were coming to the bank about nonpayment of supply bills, and that the next problem would be the raising of the weekend pay-roll. Mr. Koechlein asked him if he was prepared to do anything toward raising money, and he said he thought Commercial Factors Corporation should put up whatever money was required. Mr. Koechlein made no promise but said he would see what could be done. Smith was asked whether anything was said to the effect that any deposit that might be made by the Shoe Company, or any part of such deposit, was to be allocated or held for any special purpose. He answered, "None whatever." He was also asked, "Please state what, if anything, was said by any of you gentlemen representing the bank, that is, Mr. Kerr or Mr. Hickok, or yourself, or by Mr. Koechlein with reference to the manner of treating any deposit that might be made thereafter by the Hamilton-Brown Shoe Company." His answer was, "There was no suggestion about it, because there was no agreement on the part of Mr. Koechlein that he would make any deposit; therefore, our minds couldn't have reached a point of how to handle a deposit of that kind. We never broached anything of that kind." He testified that there was never any suggestion of impounding or earmarking, or that the check of Commercial Factors Corporation was there for any particular purpose.

Mr. Collins, president of the Shoe Company, testified that he had had no conversation with anyone to the effect that the check, or any part of it, was to be used for a special purpose. Mr. Kerr testified that nothing was said to him as to the deposit made on Friday being other than an ordinary deposit.

■ It requires no fine analysis or sifting of the evidence to demonstrate that the court was correct in finding that while there was some conversation between the representative of Commercial Factors Corporation and officers of the bank with reference to the question whether the Shoe Company would be able to meet its pay-rolls on April 15, the Shoe Company made no agreement

whatever with the bank relative to the deposit, indicating that it should be applied or allocated to any special purpose.

The checks and the funds which they represented, were the checks and funds of the Shoe Company up to the time they were deposited in the bank. Upon being deposited, they belonged to the bank and the bank became indebted to the Shoe Company therefor. The deposit balance was in effect a debt owing by the bank to the Shoe Company. New York County Bank v. Massey, 192 U.S. 138, 24 S.Ct. 199, 48 L.Ed. 380; Bank of the Republic v. Millard, 10 Wall. 152, 19 L.Ed. 897; Davis v. Elmira Savings Bank, 161 U.S. 275, 288, 16 S.Ct. 502, 40 L. Ed. 700; Fourth Natl. Bank of Wichita v. Smith, 8 Cir., 240 F. 19; German-American State Bank v. Larimer, 8 Cir., 235 F. 501. The right to set off this debt due from the bank to the Shoe Company against a debt owing by the Shoe Company is recognized by Section 68, sub. a of the Bankruptcy Act, 11 U.S.C.A. § 108, sub. a, which provides: "a. In all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid."

Plaintiff relies strongly upon the case of Brown et al. v. Maguire's Real Estate Agency, 343 Mo. 336, 121 S.W.2d 754, 757, where a deposit was held to be a trust, and hence, the bank's right of set-off denied. In the Maguire case the Supreme Court of Missouri, among other things, said: "If the bank has knowledge of the trust it has no right to set off the trustee's personal debt against the trust fund, and likewise the trustee has no general right to set off such trust fund against his own personal debt."

The lower court in that case had held that the funds were trust funds and that the bank had the knowledge necessary to bring it under this rule. The court further said: "We think it is clear that garnishee did know that much of the Agency's account, at all times when there was a substantial balance, consisted of funds collected for others. With this knowledge, even though it did not know who such other persons were or how much was held for them, the weight of authority is that garnishee was not entitled to set off its debt against such part of the funds as it could determine by reasonable investigation were held for collection and remittance to clients of the Agency."

In that case the fact of the existence of a trust was established. The bank there knew that at least a part of the deposit consisted of funds collected by the depositor for other persons, and hence, were not the property of the depositor. In the instant case, however, there were in fact no trust funds. The funds when deposited were the funds of the Shoe Company, which had the unrestricted right to check them out at its pleasure for any and all purposes.

In the case of Craig v. Bank of Granby, 210 Mo.App. 334, 238 S.W. 507, 509, the facts were strikingly similar to those in the instant case. A trustee in bankruptcy sued a bank to recover money claimed to have been deposited as a special deposit for a specific purpose. The bankrupt had made a deposit of $1,000, and the bank had applied this amount on a note it held against the depositor. It was contended by the trustee that the deposit was a special one, made for the purpose of meeting checks issued to employees. For several years prior to this transaction, the bankrupt had been making deposits in the bank and paying the money out on checks. The pay-roll was made up twice a month and a check then issued to each employee for the amount of wages due him. On May 21, 1920, checks of this character were issued by the bankrupt. At that time it did not have sufficient funds in the bank to meet these checks. On May 22, 1920, the depositor stated to the cashier of the bank that he would make a deposit in the afternoon to meet the pay-roll, and told him that the checks to pay the parties to whom the money was due had been issued the day before. Under these circumstances, a deposit of $1,000 was made at 4:10 p. m. of that day, as other deposits had been made, on the form usual in making a general deposit. After the deposit was made, the bank applied it on a note held by the bank against the depositor. The court held that there was no right in the trustee, unless it was shown that the fund was to be treated as a trust fund. In the course of the opinion, the court said:

"Although it may have been the purpose of the depositor to pay the pay roll checks out of this deposit, and that fact was known to the bank at the time, yet that does not necessarily establish the further fact that the depositor intended this deposit to be separated from its other deposits and carried as a trust fund. * * * The fact that a deposit slip was made out by the depositor in which the deposit appeared to be a general deposit ought to control in the absence of instruc-

tions and information that were sufficiently specific to furnish a guide to the bank by which it could carry out the terms of the trust which it assumed if it was to be held to have accepted the deposit as a special one, and to have thereby bound itself to comply with the terms of the trust. * * * In the absence of proof to the contrary, all deposits are presumed to be general deposits, and the burden was upon plaintiff in this case to show that the deposit of $1,000 was made by it to meet the pay roll checks that had been previously issued, and that this money or its equivalent was to be applied to the payment of these checks, and that the bank so understood it at the time. Butcher v. Butler, 134 Mo.App. 61, 114 S.W. 564.

"All previous deposits made by the same party for a long time prior to this one had been made as a general deposit, and, if the character of this one was to be changed to a special deposit, there should have been some clear direction given by the depositor that would carry to the bank the information that this was a special deposit, and how it should be disposed of by the bank. To make that proof in a way to require the bank to hold $1,000 to the credit of the mining company, and to pay no checks out of it except pay roll checks, specific instruction in some form should have been given the bank by which when a check should be presented it could determine whether it was a pay roll check and was to be paid out of that particular fund."

The Craig case is cited with approval in Landwehr v. Moberly, 338 Mo. 1106, 93 S.W. 2d 935, and Central Coal & Coke Co. v. State Bank, 226 Mo.App. 594, 44 S.W.2d 188. In Landwehr v. Moberly, supra, the Supreme Court of Missouri had before it a case to establish a preference in a closed bank. In the course of the opinion, the court said [338 Mo. 1106, 93 S.W.2d 937]: "However, the rule has been greatly relaxed so that, where the money deposited is to be used for a specifically designated purpose, it may still be regarded as a special one, even though the funds were deposited under an agreement allowing them to become mingled with other funds in the bank and they are so mingled that the identical money deposited can no longer be identified. However, that purpose must be evidenced by a mutual understanding or agreement on the part of the depositor and the bank and the intention or purpose, merely on the part of the depositor, that it should become a special deposit is not sufficient to make it so."

Not only did the depositor in the instant case not indicate an intention to create a trust or a special deposit subject to use for a specific purpose, but the evidence shows that the bank did not understand that the depositor intended so to do, or that it intended to enter into any special relationship. Nothing was done to indicate that the relationship of debtor and creditor which had before existed was to be changed into a different relationship. In these circumstances, under the law of Missouri, the plaintiff failed to establish that the deposits made by the Shoe Company were for a special purpose, or that they were funds in which third parties had an interest, so as to impress them with a trust.

Plaintiff further contends that even though the bank had no knowledge of the purpose of the deposit of the $25,958.16, yet regardless of the question of its knowledge, the equities are against its right of set-off. This is referred to as the "equitable" rule. It is to be observed, however, that the rule goes only to the question of the bank's knowledge. If, in fact, the funds when deposited were those of the depositor, and were not trust funds, there could be no question of knowledge or notice. The bank could not be charged with knowledge of a nonexistent fact or condition. It may first be noted that Missouri has not adopted this so-called equitable rule, but the application of the equitable rule could not in any event change the character of this deposit. The equity which might require the treatment of a deposit as a special rather than a general one, must be founded on agreement. Paul v. Draper, 158 Mo. 197, 59 S.W. 77, 81 Am.St.Rep. 296.

We have examined the many cases cited by plaintiff. In those cases the basis of the right claimed was that a fiduciary had deposited funds of a cestui que in a bank which, with or without notice of the cestui que's right, the bank attempted to appropriate by availing itself of the right of set-off on a debt due it by the fiduciary, without having parted with any new value in reliance on the deposit. But before this doctrine can be invoked, a trust must be found. There is no evidence to sustain a finding of a trust, nor to impose on anyone the duties of a trustee. The argument must therefore fail, first, because the doctrine is contrary to the holdings of the Supreme Court of Mis-

souri. Thus, in Horigan Realty Co. v. First National Bank, K.C.Ct.App., 221 Mo. App. 329, 273 S.W. 772, 775, the court, among other things, said: "That the relation between a bank and its depositors is one of debtor and creditor is well settled; and that when a deposit is made it becomes the fund of the bank and the deposit an ordinary indebtedness. And this is true even, though the money is held by the depositor as a trustee, unless of course the bank had notice of the true ownership thereof. It is also the established rule that the bank may apply a customer's deposit to the payment of the latter's overdue note, although the money may belong to another, unless the bank has knowledge that the money does not so belong."

Second, the argument must fail because as a matter of fact the funds were not trust funds.

It is finally contended by plaintiff that the right of set-off should not be allowed to the bank because it would be inequitable and give the bank a preferential advantage over other creditors. In the final analysis, this argument is based upon a claim of estoppel. Plaintiff cites and relies on the cases of Bollow v. Farmers' Bank of Leonard, Mo.App., 45 S.W.2d 882, and Union Bank & Trust Co. of Helena v. Loble, 9 Cir., 20 F.2d 124. In the first cited case, the bank had agreed in writing that the deposit there involved was to be held to pay all creditors on a pro rata basis. The depositor was a trustee for creditors, who was selling off the bankrupt's property. Under such facts, the bank was, of course, estopped from setting off that deposit against the bankrupt's debt to the bank. There is no analogy between that case and the instant case. Here, there was no understanding between the parties that the deposit should be treated in any special way. In Union Bank & Trust Co. of Helena v. Loble, supra, the bankrupt owed $16,000 to Eastern supply houses, owed relatives of its president $35,000, and owed local creditors $12,000. It was also indebted to the bank in the sum of $10,000 on a ninety-day note and in the sum of $1,300 on an overdraft. It

was insolvent and without funds. The bankrupt discussed with the president of the bank the question of discontinuing the business, but upon the bank's advice it was agreed that a special sale should be conducted by the bankrupt to raise money to pay Eastern creditors, with a view of reorganizing and continuing the business, and that the relatives and the bank would refrain from pressing their claims. The court found that this plan was the bank's own plan and the agreement above referred to was made upon the bank's insistence. Pursuant to this plan the sale was held and the proceeds turned into the bank. The bank paid out about one-third of the money realized from the sale, but none of it was used to pay the Eastern creditors, but was used largely to pay some of the local creditors who were relatives, and to pay current expenses and the bank's overdraft of $1,300. There was a residue of about $8,300 on the date a voluntary petition in bankruptcy was filed, and on the same date the bank applied this balance on its note. The trial court held that the deposit was in the nature of a special deposit brought about by the bank under an agreement that it was to be devoted to certain purposes, and that, "By breach of contract a trust cannot be converted to a debt, the title to special deposits cannot be transferred, and set-off against them cannot be had by the defaulting contractor." In re Gans & Klein, D.C., 14 F.2d 116, 117. The Circuit Court of Appeals, 9 Cir., 20 F.2d 124, 126, in affirming the lower court, expressed the view that, " * * * the circumstances under which the fund was created, and the co-operation of the bank and the bankrupt in its creation, were sufficient to so far impress upon it the character of a trust fund that the bank should be held estopped to assert a lien thereon or the right of set-off."

The contention of plaintiff is in the very teeth of the court's findings and of the undisputed evidence. There was here no trust fund and no agreement by the bank to treat it as such, and hence, there could be no estoppel.

The judgment appealed from is therefore affirmed.