The FIRST NATIONAL BANK OF PORTLAND, a National Banking Association, Appellant,

v.

Frank A. DUDLEY, Trustee in Bankruptcy of the Estate of Northwest Variety Wholesale, Inc., Appellee.

No. 14837.

United States Court of Appeals Ninth Circuit.

March 13, 1956.

Rehearing Denied April 13, 1956.

Pope, Circuit Judge, dissented.

Pendergrass, Spackman & Bullivant, V. V. Pendergrass, R. R. Bullivant, Walter H. Pendergrass, Portland, Or., for appellant.

Edward A. Boyrie, Portland, Or., for appellee.

Before POPE and LEMMON, Circuit Judges, and MATHES, District Judge.

MATHES, District Judge.

The First National Bank of Portland prosecutes this appeal from an order of the District Court confirming an order made by the Referee in Bankruptcy. Bankruptcy Act, §§ 2, sub. a(10), 24, 25, 39, 11 U.S.C.A. §§ 11, sub. a(10), 47, 48, 67.

The Referee's order, following a hearing on objections filed by the trustee, disallowed appellant bank's claim against the bankrupt estate for a balance of $8,184.19 remaining unpaid on the promissory note of the bankrupt, unless the bank should surrender and pay over to the trustee, appellee here, the sum of $2,889.14 "appropriated * * * from the bank account of the bankrupt" by setting-off as a credit to the bank's note the entire balance of the bankrupt's account on July 14, 1953, the day following bankruptcy.

Subject to exceptions not applicable here, § 68, sub. a of the Bankruptcy Act provides that: "In all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid." 11 U.S.C.A. § 108, sub. a.

█ Although the language appears to be mandatory, the right of set-off under § 68, sub. a is held to be permissive only, since the Bankruptcy Court, "in the exercise of the jurisdiction conferred * * * by the act, * * * applies the principles and rules of equity jurisprudence", Pepper v. Litton, 1939, 308 U.S. 295, 304, 60 S.Ct. 238, 244, 84 L.Ed. 281, and equity will intervene, where circumstances of equitable cognizance so

require, to cut off the legal right of set-off. Cumberland Glass Mfg. Co. v. De Witt, 1915, 237 U.S. 447, 455, 35 S.Ct. 636, 59 L.Ed. 1042; Prudential Ins. Co. of America v. Nelson, 6 Cir., 101 F.2d 441, 443, certiorari denied, 1939, 308 U.S. 583, 60 S.Ct. 106, 84 L.Ed. 489; Union Bank & Trust Co. v. Loble, 9 Cir., 20 F.2d 124, certiorari denied, 1927, 275 U.S. 545, 48 S.Ct. 83, 72 L. Ed. 417; 4 Collier, Bankruptcy 710 (14th ed. 1942).

In the words of Cumberland Glass Mfg. Co. v. De Witt, supra: "The provision is permissive rather than mandatory * * *. The matter is placed within the control of the bankruptcy court, which exercises its discretion in these cases upon the general principles of equity." 237 U.S. at page 455, 35 S.Ct. at page 639.

█ It may be stated then as a general proposition that, absent circumstances rendering it inequitable so to do, a bank ordinarily may, preceding or following bankruptcy, set-off any claim, provable in character and fixed as to amount, Bankruptcy Act, § 63, sub. a, 11 U.S.C.A. § 103, sub. a, against such credit balance as the bankrupt may then have on deposit with the bank. Continental & Commercial Trust & Savings Bank v. Chicago, 1913, 229 U.S. 435, 33 S.Ct. 829, 57 L.Ed. 1268; Studley v. Boylston National Bank, 1913, 229 U.S. 523, 33 S.Ct. 806, 57 L.Ed. 1313; New York County National Bank v. Massey, 1904, 192 U.S. 138, 24 S.Ct. 199, 48 L.Ed. 380; Ingram v. Bank of Cottage Grove, 9 Cir., 1928, 29 F.2d 86.

In the proceedings at bar the Referee concluded that appellant bank waived its right of set-off; also that "the bank account of the bankrupt as it existed at the time of the commencement of the within bankruptcy proceedings was created under such circumstances, with the cooperation of the bank and the bankrupt, as to so far impress upon it the character of a trust fund, that the bank should be estopped to assert a lien thereon or the right of set off."

Some detail in recital is requisite to knowledge of the facts upon which the Referee rested his conclusions, and to a determination whether the Bankruptcy Court acted "upon the general principles of equity" within the limits of discretion under § 68, sub. a of the Act.

From uncontradicted evidence and the findings made by the Referee the following facts appear: In 1946 the bankrupt, Northwest Variety Wholesale, Inc., opened with appellant bank "a general commercial account in which unrestricted deposits were made subject to withdrawal by check in the ordinary course of business. This account was in existence at the time of the creation of the loan upon which the claim of the bank is based and continued in existence without change, except as to the amount thereof, to and including the date of the exercise by said Bank of its asserted right of off-set."

The bankrupt was a wholesaler of so-called variety goods. Early in 1952, upon the advice of a "national firm of business consultants", the bankrupt "changed its operation from strictly a co-operative to more or less of a strictly wholesale variety stock."

The result was that "in the fall of 1952 the corporation found itself with a tremendous inventory, and of course the corresponding bills, which made it impossible to pay the bills." In November, 1952, the total indebtedness was "$85,-000 owing to approximately 158 creditors. But offsetting that was about $135,-000 or $140,000 worth of inventory."

The inventory "was all merchantable, but it did represent items, for instance, that could only be sold at Christmastime, other items could only be sold the following year at, say, Valentine's Day and Mother's Day and the various holidays along the line, and * * * a big school supply which wouldn't be able to be sold until the following fall."

On October 11, 1952, the bankrupt had executed a 30-day promissory note for $22,000 in favor of appellant bank, and at all times thereafter the bank was the largest creditor.

To quote from the Referee's findings: "That during the month of November, 1952, the bankrupt became unable to meet its obligations in the regular course of business as they became due, and by its president and its attorney advised said bank that it found itself in this condition, but that it had a stock of merchandise which could be sold to advantage over a period of time so as to liquidate the indebtedness owing to the bankrupt corporation; that the bankrupt proposed to said bank that if the creditors, including said bank, would refrain from seeking immediate payment of their respective accounts in full, the bankrupt would proceed to liquidate its inventory over a period of twelve months time and would pay to the bank, as well as to other creditors, a quarterly payment of twenty-five per cent of the indebtedness owing to the bank and to such creditors, the first of said payments to be made on January 15th, 1953.

"That the bank proposed a modification in said plan whereby, instead of quarterly payments of twenty-five per cent over a twelve months period of time, monthly payments of ten per cent would be made to creditors commencing with the month of January, 1953.

"That as so modified, the bank agreed that the plan was a feasible one, which should enable the bankrupt to work out of its financial difficulties, and that the bank would go along with the bankrupt on the plan and refrain from pressing for immediate payment in full of the indebtedness due it, providing that the monthly payments of ten per cent were made.

"That the bankrupt advised its other creditors of said plan and advised a number of said creditors of the approval of said plan by the bank and the participation of the bank therein, and obtained the participation of its other creditors in said plan, with the result that the bankrupt was permitted to continue in business and proceeded to liquidate its inventory in accordance with the plan, and to make the ten per cent payments monthly to each of its creditors during the months

of January, February, March, April and May, 1953."

The bank "received and accepted monthly payments of ten per cent of the principal of its note together with accruing interest in full during said five months * * *, and reduced the amount of said note to $11,000.00; that the other creditors of the bankrupt received and accepted monthly payments of ten per cent of their accounts, reducing their respective claims accordingly."

■ There is no suggestion that the ordinary course of business was not followed, so the presumption is that all proceeds from sales of inventory were, as before, deposited in appellant bank. See: Ore.Rev.Stat. § 41.360(20) and (33) (1953); 9 Wigmore, Evidence §§ 2499, ·2530 (3d ed. 1940). All ten per cent "dividend" checks to creditors were ·cleared through the account with appellant bank. In short, during all of this period up· through· the month ·of May, 1953, the bank was well advised on the progress of the extension plan.

In the words of the bankrupt's attorney, qua witness: "In June actually what the situation was, we had anticipated that the current business· would continue at a faster rate than actually ·developed. We had anticipated when the corporation went back more or less to the old way of doing business about the first of December, that is, on a co-operative basis, and judging from the past experience of the co-operative, we had anticipated that same business would come back into the corporation again. But it didn't, so there wasn't enough current business to keep the organization going, and along about what would be the sixth payment in June there wasn't enough money to make the sixth [ten per cent] payment.

"At that time we called a meeting of the stockholders to inquire whether the stockholders thought they should continue, whether they wanted to keep the corporation going on a co-operative basis, but by that time they were discouraged and decided they would just write·it off at that time, and I was authorized then to file a petition of bankruptcy."

On July 7 the bankrupt's attorney informed the bank that "he was preparing a petition in bankruptcy which would be ·filed when they had completed an inventory."

The Referee's findings continue: "The petition in bankruptcy was filed on July 13th, 1953, at which time the bankrupt had on deposit in its said account at The First National Bank of Portland the sum of $2,889.14. On July 14th, 1953, the bank offset this amount against its indebtedness, thereby reducing the amount of same to $8,184.19, in which amount the said bank has filed its claim herein; that other creditors of the bankrupt have filed their claims herein covering the balances due them after application of the five monthly payments of ten per cent as made to them under the plan of liquidation above referred to."

"That by its approval of the bankrupt's plan of payment of its creditors upon a pro-rata basis and by its participation therein, the bank so dealt with its depositor, the bankrupt, and with other creditors of the bankrupt as to waive or be estopped to assert the right to set off * * *·"

■ It was the duty of the District Judge to accept the Referee's findings "unless clearly erroneous", General Order 47, 11 U.S.C.A. following § 53; and it is the duty of this Court likewise not to disturb the findings unless they are shown to be clearly wrong. Fed.Rules Civ.Proc. Rule 52(a), 28 U.S.C.A.; Smith v. Federal Land Bank, 9 Cir., 150 F.2d 318, 321, certiorari denied, 1945, ·326 U.S. 764, 66 S.Ct. 145, 90 L.Ed. 460.

■ Equitable estoppel is an age-old principle· of equity. 2 Story, Equity Jurisprudence 776, § 1534 (12th Ed. 1877). Tacit encouragement by conduct has been held sufficient to raise an equitable estoppel. Swain v. Seamens, 1869, 9 Wall. 254, 274, 76 U.S. 254, 19 L.Ed. 554. "The vital principle", the Supreme Court ·has said, "is that he·who by his language or conduct leads another· to do what he

would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted." Dickerson v. Colgrove, 1879, 100 U.S. 578, 580, 25 L.Ed. 618.

It may be said generally then that equitable estoppel, as a principle of equity jurisprudence, stands for the basic precepts of common honesty, ordinary fairness, and good conscience, Myers v. Hurley Motor Co., 1927, 273 U.S. 18, 24, 47 S.Ct. 277, 71 L.Ed. 515, in dealing with the rights of those whose conduct has been prompted by reasonable good-faith reliance upon the knowing acts or omissions of another. 3 Pomeroy, Equity Jurisprudence 189–192, §§ 804–805 (5th ed. 1941).

Here the District Court confirmed the findings and order of the Referee upon the authority of the decision of this Court in Union Bank & Trust Co. v. Loble, supra, 20 F.2d at page 124.

In the language of the opinion, the salient facts in the Loble case were these: "In the latter part of 1925 the bankrupt was indebted to Eastern merchants in about $21,000, to relatives of its manager in the sum of $35,000, to local creditors in more than $12,000, and to the appellant [bank] in $10,000 on a note and 'over $1,000' on overdraft. The bankrupt discussed with the president of the bank the question of discontinuing the business, but upon the bank's advice it was finally agreed that a special sale should be conducted by the bankrupt to raise money to pay Eastern creditors, with a view to reorganizing and continuing the business. The special sale was had, and during the months of December and January the bankrupt deposited the proceeds thereof to its account in the bank, subject to check in the same manner as money it had previously deposited. * * * The Eastern creditors were not informed that the money realized from the sale was to be set apart as a fund for the payment of their claims. The information which they did receive was contained in a circular letter stating that the primary obligations of the business consisted of money loaned by relatives, all unsecured and in no way preferred, a small indebtedness to the bank, likewise not secured, and invoices, that the indebtedness was all on an equal basis, that relatives who had money in the business and the bank were willing to extend their loans 'and give us a chance to pay off the invoices and build up the business, and to pay you is our objective, and to do that we are preparing for a big sale. * *, * Our other creditors are willing to wait, and we only ask that you give us a reasonable opportunity to get your money for you.' * * *

"While the money was in its possession on deposit, the bank placed no obstacle in the way of its disbursement to Eastern creditors until early in January, when it became apparent that the suggested plan of reorganization had failed. Thereafter the bankrupt presented to the bank a proposition to compromise with all creditors on the basis of 25 cents on the dollar. The bank denied the bankrupt's right thus to use the money on deposit, and asserted its own claim of lien thereon."

Affirming the judgment of the District Court disallowing the bank's claim "unless the bank should account for and pay to the trustee the sum so applied as set-off", this Court in Loble said that "a bank may so deal with a depositor as to waive or be estopped to assert the right of set-off. * * * And the right does not exist where the circumstances are inconsistent with its exercise. * * * While the money realized on the special sale and deposited to the bankrupt's current account and subject to its check for general purposes may not be said to come within the accepted definition of a special deposit so as to be exempt from the bank's claim to the right of set-off * * * the circumstances under which the fund was created, and the co-operation of the bank and the bankrupt in its creation, were sufficient to so far impress upon it the character of a trust fund that the bank should be held estopped to as-

sert a lien thereon or the right of set-off." 20 F.2d at page 126.

■ So in the case at bar, the circumstances under which the inventory was being liquidated and the bank account created and maintained, "and the cooperation of the bank and the bankrupt in its creation, were sufficient to so far impress upon it the [equitable] character of a trust fund that the bank should be held estopped to assert a lien thereon or the right of set-off."

Moreover it appears that the equitable considerations for denying to the bank the right of set-off here are even stronger than in the Loble case. For in Loble the bank received no part of the fund; whereas here it was a key provision of the extension arrangement that the bank would share, and the bank did share, equally and ratably with all other creditors.

■ Looking as does equity "to the substance and not merely to the form," Young v. Higbee Co., 1945, 324 U.S. 204, 209, 65 S.Ct. 594, 597, 89 L.Ed. 890, it is plain that the substance of the transaction at bar is: that the bank, the bankrupt and the trade creditors joined in an agreement to commit the proceeds from liquidation of the bankrupt's inventory toward payment of all claims on an equal and ratable basis.

■ Proof of waiver must be such as to establish "an intentional relinquishment * * * of a known right". Johnson v. Zerbst, 1938, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461.

The conduct of the bank under the circumstances here, in entering into the extension arrangement without expressly reserving the inconsistent right of set-off, affords rational basis for the inference that the bank intentionally relinquished this known right, at least so long as the monthly ten-per cent "dividends" were paid. Indeed, the specific agreement to accept payment ratably with all creditors on the basis of ten per cent per month rendered the claimed right of set-off "inconsistent with the presumed intention of the parties." Reynes v. Dumont, 1889, 130 U.S. 354, 390, 9 S.Ct. 486, 495, 32 L.Ed. 934.

If it be true that there is no evidence the bank intended to waive the right of set-off in the event the extension plan failed, the admitted fact must be faced that the bank did not take the trouble to make known to other creditors any such limitation upon the otherwise apparently unconditional waiver.

■ Furthermore, assuming as we must, from findings of the Referee based upon uncontradicted evidence, that the trade creditors relied upon the waiver implicit in the pro-rata arrangement and forwent their rights to attach the inventory and thus prevent the proceeds from reaching the bankrupt's account with appellant bank, the least that can be said is that the bank cannot in equity and good conscience be permitted to keep its ratable share of distribution plus the right of set-off. Hence, as was said in Loble, "the bank should be held estopped to assert a lien * * * or the right of set-off." Cf. Deitrick v. Greaney, 1940, 309 U.S. 190, 197, 60 S.Ct. 480, 84 L.Ed. 694.

As Mr. Chief Justice Stone aptly said for the Court in Prudence Realization Corp. v. Geist, 1942, 316 U.S. 89, 95, 62 S.Ct. 978, 982, 86 L.Ed. 1293: "The court of bankruptcy is a court of equity to which the judicial administration of the bankrupt's estate is committed, * * * and it is for that court * * * to define and apply federal law in determining the extent to which the inequitable conduct of a claimant in acquiring or asserting his claim in bankruptcy requires its subordination * * *."

■ Since under the evidence at bar the findings as to waiver and equitable estoppel are not clearly erroneous, the Bankruptcy Court, in denying the claimed right of set-off on equitable grounds, did not abuse the discretion conferred under § 68, sub. a of the Bankruptcy Act. Accordingly the order of the District Court confirming the order of the Referee is affirmed.

POPE, Circuit Judge (dissenting).

It is clear that the trial judge would not have approved the referee's decision had he not accepted the argument that this case was ruled by the Union Bank & Trust Co. v. Loble, 9 Cir., 20 F.2d 124.[1] My dissent is based, first, on my belief that the Loble case in no way supports the conclusion here reached, but is quite distinguishable, and second, that the adoption of the rule here proposed will in the long run have a seriously injurious effect upon banking and business practices.

Differing from the circumstances here, the facts in the Loble case were that the bank (a) itself formulated and proposed the plan, (b) at a time when there was nothing on deposit, which plan (c) called for special sales to be made for a declared special purpose, whereby (d) funds designed to be used for this special purpose came into the hands of the bank as they would otherwise not have done, and (e) the bank itself was the first to violate its own agreement as to the special use of the funds by asserting its own claim of lien.

Hence the court said that the circumstances under which the Loble case fund was created "were sufficient to so far impress upon it *the character of a trust fund* that the bank should be held estopped to assert a lien thereon or the right of set-off." (Emphasis mine.) By quotation from another case, the court indicated its view that the deposits made in the Loble case "were obviously not made in ordinary course, in any fair sense of that phrase."

Quite the contrary situation existed here. This plan was proposed by the bankrupt, modified to meet a suggestion of the bank, and the bank (a) agreed to "go along with the bankrupt on the plan. * * * providing that the monthly payments of ten per cent were made". At the time, (December, 1952) (b) there were already funds on general deposit in the bank. (The amount that month ranged from $8,165.79 to $22,301.09, and the bank had loaned $22,000 on October 11, preceding.) (c) The sums in the bank at date of exercise of set-off were $2,889.14. The fund existing when the plan was initiated was depleted during the liquidation program. (The bank's situation got worse instead of better.) (d) The sales under the extension agreement were in ordinary course and the proceeds were not earmarked for any special purpose nor did the execution of the plan place in the bank funds it would not otherwise have had. And (e), the bank itself fully carried out its agreement, and it was not until the bankrupt filed its petition that the bank claimed the set-off. Thus it is apparent that we have here none of the factors which led to the Loble decision, namely, proceeds of a special sale which created a fund under circumstances sufficient to impress upon it "the character of a trust fund."

That the Loble decision was limited to those special facts above outlined has been stated by both this and other courts. In Ingram v. Bank of Cottage Grove, 9 Cir., 29 F.2d 86, 87, this court, distinguishing it, said: "True, it was held in the Loble Case that the bank waived, or was estopped to assert, its right of set-off, because of an agreement between the

---

1. The opinion of the judge, in its entirety, was as follows: "Memorandum of Decision—Because I am not impressed as an original proposition that such a loose arrangement, as presented here, should work a loss of the bank's right of set-off, I have examined Union Bank & Trust Co. v. Loble, 20 F.2d 124 closely. The learned referee thought it was controlling; counsel for petitioner strongly urges that the present case and that case are distinguishable.

"I do not feel that I should strain to distinguish the Loble case, and I will follow the view the referee took of it.

"If, as appears to be the case, petitioner feels that the referee's decision (and my affirmance) will seriously affect banking practices, petitioner is in position to take the question to the Circuit Court. If that is done, I would suggest that the Circuit should not be limited, as the presentation before me was limited, to consideration only of the findings made by the referee."

bank and the bankrupt that *certain moneys derived from a special sale* conducted by the bankrupt and *placed on deposit in the bank should be paid to certain eastern creditors,* but there is no basis for any claim of waiver or estoppel here." [2] (Emphasis mine.)

The rule properly applicable here is that stated in Killoren v. First Nat. Bank in St. Louis, supra, note 2, 127 F.2d at page 542, as follows: "Nothing was done to indicate that the relationship of debtor and creditor which had before existed was to be changed into a different relationship. In these circumstances, under the law of Missouri, the plaintiff failed to establish that the deposits made by the Shoe Company were for a special purpose, or that they were funds in which third parties had an interest, so as to impress them with a trust."

I can find here none of the elements of an estoppel. Those are (a) some representation made by one party upon which (b) the other party relies and changes his position to his detriment. Bankrupt proposed the plan. The bank did no more than agree to go along. It got no more benefit from the plan than any other creditor. Indeed it may well have gotten much less. The exact day when the bank's agreement was procured does not appear, but if it was that day in December, 1952, when the deposit was $22,328.-59, then its agreement to "go along" surrendered a then possibility of its collecting in full by applying the account. How the creditors can say they changed position to their detriment in reliance on any act or representation of the bank, I cannot see.

The type of arrangement here attempted was designed to accomplish a useful object,—to get a faltering business on its feet, all to the end that ultimately all creditors may be paid, and the owner save his business. True, the attempt failed, but it was worth the try. Such attempts, I think, should be encouraged. But from now on no bank, creditor of such a debtor, will dare to agree to "go along", on such a plan, because if it should fail, and bankruptcy follow, as here, the bank would risk being held to have waived its right of set-off. That is the principal reason why I think the rule of the Loble case should not be extended to this case where the facts are so different.

2. These clear limitations of the Loble case have been noted in other circuits. Thus in Killoren v. First Nat. Bank in St. Louis, 8 Cir., 127 F.2d 537, 543, the court, after outlining the facts of the Loble case, described its holding as follows: "The trial court held that the deposit was in the nature of a special deposit brought about by the bank under an agreement that it was to be devoted to certain purposes, and that, 'By breach of contract a trust cannot be converted to a debt, the title to special deposits cannot be transferred, and set-off against them cannot be had by the defaulting contractor.' In re Gans & Klien, D.C., 14 F.2d 116, 117. The Circuit Court of Appeals [Union Bank & Trust Co. v. Loble], 9 Cir., 20 F.2d 124, 126, in affirming the lower court, expressed the view that, '* * * the circumstances under which the fund was created, and the co-operation of the bank and the bankrupt in its creation were sufficient to so far impress upon it the character of a trust fund that the bank should be held estopped to assert a lien thereon or the right of set-off.' "

And in Citizens Nat. Bank of Gastonia, N. C. v. Lineberger, 4 Cir., 45 F.2d 522, 530, the court said: "In Union Bank & Trust Co. v. Loble * * * the deposits made were proceeds of a special sale, held on the advice of the bank, to raise funds for Eastern creditors. It was held that the circumstances under which this fund was created and the co-operation of the bank and the bankrupt in its creation so far impressed it with a trust as to estop the bank from asserting its right of set-off."