JACOB WASSERMAN, trustee in bankruptcy, *vs.*
C. CRAWFORD HOLLIDGE.

Suffolk.    January 21, 1929. — June 3, 1929.

Present: RUGG, C.J., CROSBY, PIERCE, WAIT, & SANDERSON, JJ.

*Bankruptcy*, Preference, Set-off. *Equity Jurisdiction*, To recover property conveyed in preference of creditors. *Bills and Notes. Payment. Equity Pleading and Practice*, Findings by judge, Appeal.

Under a contract between a fur dealer and a merchant, the fur dealer hired rooms in the merchant's store and paid to the merchant rent and certain other sums; bills for goods sold by the dealer were rendered through the merchant, who made all collections thereof; and settlements were made monthly between the parties. Thereafter, in December of a certain year, the dealer requested the merchant to settle certain obligations for him and agreed that, if the merchant could obtain a discount from the creditors, he "could have it for his trouble." The merchant obtained a discount and paid the creditors, for which the dealer gave the merchant a note payable in June of the next year. This note was renewed, to become due September 10 of that year. The merchant discounted the note at a bank. In July, the dealer owed the merchant a certain sum in their accounting under the contract for previous months, and the dealer then gave the merchant another note payable October 13, which the merchant also discounted at the bank. At maturity of both notes, the merchant paid the bank the amounts thereof and charged such amounts to the dealer in their monthly settlements for August and September. The dealer was adjudicated a bankrupt on October 27, having been insolvent since September 1. In November the merchant for the first time charged to the dealer and deducted from money due him the amount of the discount obtained from the dealer's creditors. In a suit in equity thereafter commenced against the merchant by the dealer's trustee in bankruptcy, to recover the amounts of the two notes and the discount, a stenographer was appointed under G. L. c. 214, § 24; Equity Rule 29 (1926). The judge who heard the suit found that the defendant had reasonable cause to believe the dealer insolvent as early as October 1, but not on September 10, and a decree was entered dismissing the bill. Upon appeal by the plaintiff, it was *held*, that

(1) The rule, that this court should review all the evidence, oral and documentary, and, giving due weight to the findings by the trial judge, order such decree as justice might require, was applicable to the findings on the question of fact, whether the defendant had reasonable cause to believe the dealer insolvent on September 10;

(2) A mere suspicion as to such insolvency on the part of the defendant was not sufficient to warrant a finding that he had reasonable cause to believe its existence: such reasonable cause to believe exists only where there is reasonable cause for inquiry;

(3) It could not be said by this court, after an examination of all the evidence, that the finding of lack of reasonable cause to believe on September 10 was plainly wrong;

(4) A contention by the plaintiff, that the payment of the second note to the bank by the defendant constituted a payment by the dealer to relieve the defendant of his liability on the note as indorser, could not be maintained;

(5) The evidence and findings by the judge imported a further finding by him that the second note was given with intent of the dealer and the defendant that it should discharge the obligation represented by it only if it were paid when due;

(6) Upon such a finding, that obligation was revived when the defendant was required to and did pay that note at maturity;

(7) In such circumstances, findings were not required as a matter of law that the defendant, under § 68b of the national bankruptcy act, was not entitled to set off that obligation against his indebtedness to the dealer;

(8) Since the amount of the discount obtained by the defendant accrued to the defendant in December, he was entitled to set it off against the dealer's indebtedness to him although he had not charged it to the dealer until after the dealer had been adjudicated a bankrupt;

(9) The final decree was proper and was affirmed.

BILL IN EQUITY, filed in the Superior Court on May 12, 1927, and described in the opinion.

The suit was heard by *Cox*, J., a stenographer having been appointed under G. L. c. 214, § 24; Equity Rule 29 (1926). Material facts found by the judge are stated in the opinion. By his order, a final decree was entered dismissing the bill. The plaintiff appealed.

*M. M. Horblit*, (*D. A. Rose* with him,) for the plaintiff.

*E. A. McLaughlin, Jr.*, (*W. J. Kelleher* with him,) for the defendant.

PIERCE, J.   This is an appeal from a final decree of the Superior Court dismissing the plaintiff's bill of complaint. The bill was brought by the plaintiff as trustee in bankruptcy of the estate of George E. Miller, who filed a voluntary peti-

tion in bankruptcy on October 27, 1925, and was adjudicated a bankrupt on that date. The amended bill seeks to recover alleged preferential payments aggregating $17,252.86, received by the defendant within four months prior to the filing of the petition in bankruptcy. The case was heard by a judge of the Superior Court who filed "findings of fact, rulings and order for decree." A stenographer was appointed and all the evidence taken is now before this court.

The sums which are sought to be recovered are involved in four transactions as follows: (1) The payment of a note of $5,000 on September 4, 1925. This note was made by Miller and was payable to the defendant, who indorsed it over to the First National Bank for discount. It was not paid at maturity (September 4, 1925) and went to protest, the bank charging its amount to the defendant's account. (2) The payment of a note for $5,000 on September 10, 1925. This note was also made by Miller and was payable to the defendant, who indorsed it over to the First National Bank for discount. When it fell due, on September 10, 1925, it was paid by the defendant's check payable to Miller and indorsed by him to the bank. (3) The payment of a note for $5,000 on October 13, 1925. This note was made by Miller and was payable to the defendant, who indorsed it over to the First National Bank for discount. When it fell due on October 13, 1925, it was paid directly to the bank by the check of the defendant. (4) Items of discount amounting to $2,252.86 to which the defendant was entitled by virtue of an agreement made with Miller in December, 1924, but which were not charged by the defendant to Miller, nor deducted from money due the latter, until after Miller was adjudged a bankrupt.

The evidence supported the following findings of the trial judge: The defendant had conducted a department store since 1909, but had never had a fur department in his store until he made an arrangement for one with Miller, who was an experienced fur man and had been for years the fur buyer for one of the large department stores in Boston. On June 25, 1923, Miller and the defendant made an agreement in writing under seal, which provided in substance that the de-

fendant should lease to Miller for five years from August 1, 1923, two rooms in his store for the purpose of doing a fur business only.   Miller was to pay a rental, $1,000 per month in advance, and such further sums as should be equivalent to fourteen per cent of the gross collection of said business in excess of $85,700 for the year.   He was also to pay the cost of his advertising at the regular contract rates, telephone service, delivery of parcels, expressage, and all taxes on merchandise or income of whatsoever nature.   Heat, light, porter service, wrapping paper and boxes for delivery and window display space were to be furnished by the defendant without charge.

"On August 15, 1924, they modified in writing this agreement as to the space to be occupied by Miller in the defendant's store and by providing that the monthly settlements should thereafter be made on the basis of net sales for the month, instead of settling for accounts collected.   In consideration for this new method of settlement Miller was to pay the defendant each month two per cent on net sales and was still to bear the loss on bad accounts.   This payment was to be in addition to the payment of $1,000 per month and 14 per cent on gross collections, provided for in the agreement of June 25, 1923, the expressed intention of the modification being that if total collections from Miller's sales should exceed $85,700 annually, then he should pay the defendant an amount equal to 16 per cent on net sales, but if his collections were less than $85,700 annually, then he should pay the defendant $12,000 in monthly instalments of $1,000 plus 2 per cent on net sales.   All credits on sales of a previous month were to be considered a reduction of net sales for the month in which credit was taken.   All other provisions of the original agreement remained unchanged."

Miller commenced business on a very small capital ($3,000 or $4,000) although this was not known to the defendant. He did his own buying and his creditors dealt directly with him, except as hereinafter stated.   All the goods which he sold were billed through the defendant, who made all collections.   His credit sales were passed upon by the defendant's credit man.   In so far as the customers were concerned they

apparently dealt with the defendant. Each week a statement was prepared by the defendant's accountant, showing the amount of Miller's sales with comparative figures for the corresponding week in the previous year, after this became possible, and the amount of the season's business with a comparison of the previous season; but there was no statement showing the amount of Miller's purchases or liabilities. The defendant also had a monthly statement which showed the expenses of Miller's department which were due the defendant under their contract. The average monthly expenses of Miller under the contract amounted to about $1,661. His only other expenses aside from merchandise purchased were for wages averaging about $125 per week; this sum does not include anything for his own services. The settlements called for by the contract were made monthly, the dates ranging from the sixth to the fourteenth.

Late in December, 1924, Miller had not been filling his orders and there was a complaint in the office of the defendant about the nondelivery of a coat. Miller told the defendant "that he was unable to pay some of his bills and that some of his creditors were crowding him for money; that if they would let him alone for a little longer, he thought he would be all right; that his business was increasing and if the season had not been backward he would be all right, and that he had merchandise on hand to the value of from" $48,000 to $50,000. He also gave the defendant the names of these creditors, six in number, and the amount due them. At this time the defendant learned that the manufacturers were withholding shipments of furs, and Miller told him they would not ship any more goods until he paid them. The total amount then owing by Miller to these manufacturers was $27,262.88. Miller requested the defendant to pay these bills. He had lost his right to discounts, and agreed that if the defendant could obtain any discount he could have it for his trouble. Thereupon the defendant obtained discounts amounting to $2,252.86, and by his own checks and by checks of his son, paid the creditors $25,010.02 and received receipted bills.

After the payment to the creditors Miller gave the defendant five notes for $5,000 each, payable March 13, 1925, April 10, 1925, May 8, 1925, June 12, 1925 and June 26, 1925, respectively. The defendant discounted all five notes at the First National Bank. The first three notes were paid by Miller at maturity. The notes payable June 12 and June 26, 1925, were renewed to September 4 and September 10, 1925, respectively, and notes were indorsed and discounted by the defendant at the First National Bank. "When the first note came due on March 13, 1925, the defendant gave Miller a check for $5,000, which the latter turned over to the First National Bank, where all the notes had been discounted by the defendant, and paid the note. This $5,000 was due Miller on the accounting for the business in February. The second note, due April 10, 1925, was paid in the same way. When the third note came due on May 8, 1925, the defendant owed Miller, on the accounting for April, $4,857.63, and a check for this amount was given to Miller, which with Miller's check for $142.37, payable to the defendant, went to the bank to pay the note."

"Miller's sales for January, 1925, as credited on the defendant's books, amounted to $14,777.25, to which was added a further credit of $913.78, described as 'Sales to July, 1924.' On February 14, 1925, the defendant paid Miller $14,489.71. Miller's credit with the defendant for the months of February, March and April, 1925, amounted to $9,985.38, $5,951.75 and $5,515, respectively, a total of $21,452.13. In the settlement for these months, $5,000 was used by Miller in both March and April to pay the first two notes, and $4,857.63 was used by him in May to pay the third note, making a total of $14,857.63. The entire credits of these three months, with the exception of about $340, went to pay the defendant for his proper charges under the contract and the three notes."

The fourth note, due September 4, 1925, went to protest, and was charged by the bank to the defendant's account. The amount of this note was charged by the defendant to Miller in the settlement of the August business. On Sep-

tember 4, the net credit to Miller on the defendant's books was about $17,000. The payment of this note constitutes the first item in issue.

The renewal note payable September 10, 1925, was paid in the following manner: On September 9, the defendant made out a check to Miller on which was indorsed before delivery the words "Payable to the order of the First National Bank." Miller indorsed this check and the defendant's bookkeeper took it to the bank, paid and obtained the note. On September 10, 1925, the net credit to Miller on the defendant's books including sales to that date was about $18,000. The defendant's statement for the August business shows charges of these two notes and contract expenses and a balance due Miller of $3,230.12 which was paid him on September 16 and 17, 1925. The payment of the note of September 10 constitutes the second item in issue.

The net result of Miller's business for the months of May and June, 1925, was that Miller owed the defendant on the contract $2,894.56. When the monthly settlement was made on July 14, 1925, the defendant gave Miller a check for $2,105.44 and took Miller's note for $5,000 payable on October 13, 1925. The defendant indorsed and discounted this note at the First National Bank. This loan was made at Miller's request to tide him over the dull season. At the same time, on the defendant's demand, he gave him an assignment of his insurance policies on which he had already borrowed from the respective insurance companies, telling the defendant that said policies of insurance "were all the security he had." The cash surrender value of them was only about $660. This note, due October 13, 1925, was paid by the check of the defendant payable to the First National Bank, and was charged to Miller in the statement of the September business. The September business was balanced about October 13, 1925. Miller then owed the defendant $1,614.86 against which the defendant held C.O.D. orders amounting to $3,986.20. This constitutes the third item in issue.

Miller was adjudicated a bankrupt on October 27, 1925. On November 1, 1925, the defendant charged Miller on his

books with $2,252.86, the items of discount he had agreed to allow the defendant when the latter settled with the creditors in December, 1924. This payment constitutes the fourth item in issue.

On November 22, 1925, the plaintiff as trustee made demand on the defendant for the $15,000 alleged to have been received by way of preference. No demand was made for the discount item $2,252.86 until the amendment to the bill was allowed on June 21, 1927.

On August 1, 1925, Miller's bank balance was $31.08. On September 1, and October 1, 1925, his account was overdrawn $11.45 and remained so overdrawn until the petition in bankruptcy was filed. On September 1, 1925, he had stock on hand inventoried by him at cost at $44,000, which had a retail value of $71,940. On that day his due and overdue debts were $33,477.26; on September 4, and 10, 1925, $38,477.26 including one of the defendant's notes; on October 13, 1925, $47,317.93 including one of the defendant's notes. He also owed $42,329.64 which was not payable until after October 26, 1925, and from which $30,000 to $35,000 were not payable until December, 1925. From March 1, 1925, to October 26, 1925, Miller paid his general creditors $3,274.30 and the defendant $35,527.16. During this period he received from the defendant on account of his business $6,608.20, not including the checks received which went to pay notes; and he purchased merchandise amounting to $54,369.06. After August, 1925, he received payment from the defendant for his C.O.D. orders only on the amounts which had been collected. The defendant was settling with Miller after August 1, 1925, on the basis of his sales. C.O.D. orders were sometimes taken for goods sold but not to be delivered until some considerably later date and this was the reason for the new arrangement for selling the C.O.D. accounts. "It was not until after September 10, 1925, that the defendant knew anything about Miller's purchases or his liabilities, aside from the accounts which he paid in December, 1924."

Some time early in September, 1925, one of Miller's creditors, whose account against Miller the defendant had paid

in December, 1924, came to Boston and saw the defendant. He told the defendant he had come to collect Miller's past due account and asked him if he (the defendant) would pay it, as he had previously paid others in December. The defendant replied that he would not, but would come to New York to see the creditors. On September 29 or 30, 1925, the defendant attended a meeting of Miller's creditors in New York, and read a statement which had been prepared by his accountant as of September 26, 1925, from information furnished him by Miller as to his inventory purchases and other material matters. It was inaccurate and especially so as to the goods purchased, the amount of which was understated by some $40,000. It also showed the inventory at cost as of September 26, 1925, to be $40,590.00. The inventory as of July 31, 1925, was $23,654.37. At this meeting the majority of the creditors expressed confidence that Miller would work it out, and with but two exceptions, each one offered to back him for from $5,000 to $10,000. The defendant offered to operate Miller's business as receiver or manager, take Miller into his employ, pay him a salary and reinstate him in a year if he "worked out." Upon the defendant's return from New York, another statement was prepared, which showed that Miller owed over $75,000 to merchandise creditors, and $5,000 to the defendant; that his assets, taking his stock at cost, were $50,002.27, and taking his stock at retail prices, $75,602. On October 5 or 6, 1925, the two creditors who had been in Boston came again as a committee to find out what Miller's assets were. They saw the statement and inventoried the assets at about $30,000.

Miller's account book in which he kept a record of his purchases and other transactions commenced as of July, 1924. He had destroyed the one used prior to that date. Neither the defendant nor any one in his employ ever had access to Miller's books until October, 1925, and knew nothing of his bank credits or accounts. Not until the 28th or 29th of September, 1925, did the defendant, or any of his employees, know anything about Miller's liabilities, aside from the debts paid in December, 1924, nor did they know what prices Miller was charging for his goods, except from casually seeing

the sale tags.   The creditors have received a dividend of ten per cent and there may be another of possibly ten per cent. The trustee has received $19,223 from the sale of Miller's assets and expects to receive about $5,000 more.   "It is not questioned but that if the defendant retains the amounts of the alleged preference he will be enabled to obtain a greater percentage of his debt than any other of such creditors of the same class."   The trial judge found that Miller was insolvent as early as September 1, 1925.   The defendant in his brief does not contend that Miller was not insolvent as early as September 1, 1925.   We therefore put to one side any possible contention that Miller was solvent on September 4, 1925, and September 10, 1925.

The trial judge found in substance that upon all the evidence the defendant, until after September 10, 1925, did not have reasonable cause to believe that Miller was insolvent, and that if he received payments from Miller a preference would not be effected until the fifth note was paid.   The judge further found "that as early as October 1, 1925, the defendant had reasonable cause to believe that Miller was insolvent, and that if he thereafter received a payment from Miller a preference would be effected, and that any payments thereafter would be voidable unless the defendant had a right of set-off."

The plaintiff contends that the trial judge erred in failing to find that the defendant, on September 10, 1925, had reasonable cause to believe Miller insolvent.   He argues that the answer to the question whether or not there was reasonable cause to believe insolvency does not depend upon contradictory evidence or upon the credibility of witnesses, but depends upon the testimony given by the defendant himself, and by his own agents, as well as upon the circumstances disclosed by the defendant's own records and documents, and invokes the rule that "When a case is presented to this court on appeal from a decree entered on a master's report, without full recital of evidence, this court draws its own inferences from the facts found without giving weight to the decree. It is in this respect in the position of the trial judge."   *Adams* v. *Whitmore,* 245 Mass. 65, 67, 68.   *Peirce* v. *Moison,* 256

Mass. 528, 530. The rule relied on is not here applicable. There is a full recital of all the evidence, oral and documentary, and in such circumstances the court reviews the whole case and, giving due weight to the findings of the trial judge, orders such decree to be entered as justice may require. *Lindsey* v. *Bird,* 193 Mass. 200. *Hayes* v. *Penn Mutual Life Ins. Co.* 222 Mass. 382, 385. *Cook* v. *Mosher,* 243 Mass. 149, 152, 153. *Weinstein* v. *Miller,* 249 Mass. 516, 520. In the instant case the stenographer's report covers two hundred and forty-seven pages of printed oral testimony; the reported documentary evidence occupies twenty-three printed pages. The rule last stated is applicable to the findings of fact made by the trial judge on the question whether the defendant had reasonable cause to believe the bankrupt was insolvent on September 4 and 10, 1925. *Rubenstein* v. *Lottow,* 223 Mass. 227.

The question whether the defendant had reasonable cause to believe such insolvency was one of fact to be ascertained by a consideration of all credible evidence and the reasonable inferences of which it is rationally susceptible; a mere ground of suspicion is not enough, though the same circumstances which to some minds would merely give ground for suspicion may also afford evidence which to other minds would carry conviction that they not only showed a reasonable cause but actually created a real belief. *Rogers* v. *American Halibut Co.* 216 Mass. 227, 229. *Batchelder* v. *Home National Bank of Milford,* 218 Mass. 420, 422. *Jacobs* v. *Saperstein,* 225 Mass. 300, 301. *Walser* v. *International Union Bank,* 21 Fed. Rep. (2d) 294, and *In re Andrews,* 135 Fed. Rep. 599, are instances where the appellate courts draw a different inference of reasonable cause to believe from the one drawn by the lower court. Reasonable cause to believe exists where there is reasonable cause for inquiry. *Walsh* v. *Lowell Trust Co.* 245 Mass. 455, 460. *Cregg* v. *Merchants Trust Co.* 248 Mass. 524, 529. Having in mind that the plaintiff had the burden of proving that when the payments were made on September 4 and 10, 1925, the defendant had reasonable cause to believe Miller was insolvent, and that the enforcement of the transfer would result in diminishing the bank-

rupt's assets applicable to the payment of creditors of the same class, U. S. St. 1898, c. 541, as amended by U. S. St. 1910, c. 412, § 11, on examination of the entire record we are led to the conclusion that the finding of the trial judge, that the defendant did not have reasonable cause to believe on the above dates that Miller was insolvent, cannot be said to be clearly wrong. The third transaction occurred on October 13, 1925, when the note dated July 14, 1925, matured. The undisputed evidence is that this note was paid by the check of the defendant to the First National Bank on October 13, 1925, and was charged to Miller in the statement of the September business. At the time the defendant reacquired the note there was a surplus due Miller on the monthly settlement for September against which the payment of the note was charged.

The evidence does not warrant the contention of the trustee that the check which the defendant gave the bank to take up the overdue note upon which he was liable to the bank as a payee indorser was in legal effect a payment by Miller to relieve the defendant from liability on that note. *Kobusch* v. *Hand,* 156 Fed. Rep. 660. The money which the bank received obviously was the money of the defendant. *Mason* v. *National Herkimer County Bank of Little Falls,* 172 Fed. Rep. 529, 531. After the defendant had reacquired the note his claim against Miller was on the note or on the account for which it was given and received. Upon a consideration of all the evidence, and more particularly of the facts found by the trial judge, we think it follows that he must have found as a conclusion of fact, and we assume he did, that the note of July 14, 1925, was given by Miller and received by the defendant with their intent that its sole effect would be to discharge the account in case it was paid when due and not otherwise. *Curtis* v. *Hubbard,* 9 Met. 322. *American Malting Co.* v. *Souther Brewing Co.* 194 Mass. 89. If such was the fact and the defendant as payee indorser of the note had to take it up and pay it at the discount bank when it fell due, it followed that the rights of the defendant and the obligations of Miller upon the account, which were suspended during the life of the note, were revived. It further followed

therefrom that the judge was not required, as matter of law, to find the note was reacquired by the defendant with a view of using it or the account for which it was given as a set-off against his indebtedness to Miller, under the provision of § 68b of the bankruptcy act, U. S. St. 1898, c. 541, as amended. *National Bank of Newport, New York* v. *National Herkimer County Bank of Little Falls*, 225 U. S. 178, 186.

The fourth transaction complained of concerns certain items amounting to $2,252.86, to which the defendant was entitled by virtue of the December, 1924, agreement, *supra.* This debt, not charged on the defendant's books to Miller until November 1, 1925, after he was adjudicated a bankrupt, arose in 1924. The right to set it off against any sum due to Miller from the defendant was not affected by the fact that no book account was made of it until after the known insolvency of Miller. *Studley* v. *Boylston National Bank*, 229 U. S. 523, 528, 529.

It results that the decree dismissing the bill must be affirmed with costs.

*Decree accordingly.*