Charles C. SHAW, as Trustee in Bankruptcy of Bemporad Carpet Mills, Inc., Bankrupt, Plaintiff,

v.

WALTER E. HELLER & COMPANY, Defendant.

No. 9149.

United States District Court
N. D. Georgia,
Atlanta Division.
June 21, 1966.

Clinton J. Morgan, Rome, Ga., for plaintiff.

King & Spalding, Atlanta, Ga., Leibman, Williams, Bennett, Baird & Minow, Greenberger, Krauss & Jacobs, Chicago, Ill., for defendant.

## PRELIMINARY STATEMENT AND FINDINGS

SIDNEY O. SMITH, Jr., District Judge.

This is a suit in which the plaintiff Trustee in Bankruptcy seeks to recover as alleged preferential transfers some $295,298.89 passing to the defendant factor from the bankrupt manufacturer during the four-months period preceding adjudication in bankruptcy. The Trustee contends that all of such transactions constitute preferences under Section 60 of the Bankruptcy Act (11 U.S.C.A. § 96).

As background, it is necessary to understand that the defendant factor had done business with the bankrupt and its predecessor (Croft Carpet Mills, Inc.) over several years.

On June 26, 1962, Bemporad (then "Croft Carpet Mills, Inc.") filed a petition for reorganization under Chapter X of the Act. The reorganization proceeding was dismissed after Bemporad arranged through financial commitments from Heller and others to satisfy its creditors.

On November 13, 1962, the financing arrangements with Heller were approved by the reorganization Court and provided a line of credit of $430,000. for Bemporad of which $330,000. was immediately loaned, the balance to be available for commitments and payments by Heller to Bemporad's suppliers to induce them to ship raw materials to Bemporad. To secure this line of credit Bemporad concurrently gave Heller a security deed upon its real estate and equipment, which security deed was duly recorded under State law.[1] Tufted Rug Mills, Inc., a subsidiary of Bemporad, guaranteed all indebtedness owing from Bemporad to Heller. This guaranty was secured by a security deed upon Tufted's real estate which security deed was duly recorded.

On November 13, 1962, Bemporad and Heller entered into a factoring agreement[2] which provided that Bemporad would sell acceptable accounts receiva-

[1]. Besides securing the real estate and machinery loan of $330,000., the security deed provided:

Grantor expects to become or may become indebted from time to time, at Grantee's discretion, for various additional sums of money to be advanced by way of loans, endorsements and/or other forms of indebtedness, or obligations arising out of financing arrangements between Grantor and Grantee, or otherwise (hereinafter referred to as "advances") to be used or resulting from or arising out of the conduct of Grantor's business. This conveyance is made also for the purpose of inducing Grantee to make such advances and to secure and make certain the payment by Grantor to Grantee of all such advances and any notes or instruments evidencing the same, or any other obligations, howsoever and whensoever arising from Grantor to Grantee, together with interest thereon made, created, accruing or owing by Grantor to Grantee, within the period of any time during which Grantor for any reason whatsoever may be indebted or obligated to Grantee, and also any other indebtedness of whatever kind or character, whether otherwise secured or not, that may be owing by Grantor to Grantee, up to the date of the foreclosure of his conveyance; provided, however, that the aggregate amount secured hereby, including the balance, if any, on the above-described note shall at no time exceed the sum of Four Hundred Thirty Thousand Dollars ($430,000.00).

[2]. Part of this agreement provides: "Any amounts owing by you to us for merchandise purchased from any concern factored or financed by us, or for commis-

ble to Heller. Notice of assignment of accounts receivable was duly filed under State law. Pursuant to the factoring agreement, Bemporad delivered to Heller numerous schedules and assignments of accounts receivable, almost on a daily basis. The schedules and assignments contained language tying the accounts receivable to any other obligation or agreement between the parties.[3]

On December 19, 1962, to enable Bemporad to purchase a Supertufter, Heller loaned Bemporad $96,639.75[4] (including interest added) secured by a bill of sale to secure debt on the Supertufter which was duly recorded.

On August 8, 1963, Heller loaned Bemporad $100,079.,[4] secured by negotiable warehouse receipts covering jute.

From the inception of the factoring arrangement to the date of bankruptcy, Heller and Bemporad were engaged in two principal activities. One was the continuous purchasing by Heller of substantially all of Bemporad's accounts receivable, which aggregated $703,720.67 during the four months period.[5]

▉▉▉ There is no contest here that the collection by Heller of the accounts receivable purchased for a present consideration constituted a preference.

Such assignment and collections, even though they occur within the four-months period do not result in voidable preferences. 8A C.J.S. Bankruptcy § 217(4) at 70; Wolf v. Aero Factors Corp., 221 F.2d 291 (2nd Cir. 1955); Doggett v. Chelsea Trust Co., 73 F.2d 614 (1st Cir. 1934). Compare Blackford v. Commercial Credit Corp., 263 F.2d 97 (5th Cir. 1959), where there was no present consideration. Likewise, authorized charges may be made against a reserve account without creating a preference. Porter v. Strevell-Paterson Finance Corporation, 292 F.2d 706 (10th Cir. 1961). The difficulty arises by virtue of the fact that Heller did not remit the advances to Bemporad for receivables purchased, but simply credited, as is customary in the trade, the amounts in an "Account Current", showing a running balance and reserves in favor of Bemporad throughout the period in question.

The other primary activity of Heller was the effecting of arrangements with suppliers to ship raw materials to Bemporad. Bemporad frequently requested Heller to provide assurance of payment to five of its suppliers in order to obtain raw materials.[6] Four of these suppliers (Burkhart-Schier; Pharr Yarns; Fulton Cotton Mills; Painter Carpet Mills)

sions, interest, etc., may, at our option, at any time be considered as advances against your sales accounts and chargeable to you."

3. All assignments of accounts receivable provide: "All our representations, warranties, agreements, undertakings and obligations herein or in any other existing or future agreement with the Assignee contained, or otherwise expressly or impliedly assumed or undertaken by us, and all rights, powers, privileges and remedies of the Assignee under or in respect thereof, shall be deemed cumulative and continuing and not in limitation, substitution, derogation, release or discharge of any one for any other, and none thereof is exclusive; and no failure or delay of the Assignee to exercise or enforce any thereof, or to insist on strict compliance with or performance by us of any thereof, shall operate as a waiver, modification, release or discharge thereof."

4. All notes of Bemporad to Heller provide: "To secure the payment of the principal and interest of this note and all renewals and extensions of the same or any part thereof and any and all other sums, indebtedness and liabilities now or hereafter owing or to become owing from the undersigned to the payee, or the holder hereof, howsoever created, arising, evidenced or acquired by said payee or holder, whether direct or contingent, the undersigned has assigned, pledged, deposited and delivered to the payee the following (hereinafter called 'Collateral') :"

5. The entire record of debits and credits, outside of foreclosure following bankruptcy, is best understood by the details of Defendant's Exhibits II and JJ, hereby made a part of these findings.

6. Several times such oral request and direction was given. On October 23, 1963, Bemporad's President, Allen, wrote two letters of authorization to Heller. The body of such letters provided:

were factoring clients of Heller having factoring agreements similar to Bemporad's and Heller purchased, without recourse, invoices arising out of shipments to Bemporad by those suppliers. As to the remaining supplier, DuPont, Heller did not purchase the account, but guaranteed the account. In either case, payment was effected by transfer from the account current. The purchase of supplier's invoices and the guaranty of DuPont invoices was a continuing business decision made by Heller, based on its entire "security" position, including the status of the real estate note, chattel mortgages, and the condition of the account current. During the four-months period the total advances and commitments which Heller honored totaled $702,382.55.

The Trustee contends that the application of funds in the account current during the four-months period for payment to these third parties on obligations assumed by Heller resulted in preferences to Heller. While there are other smaller claims, these two types of transactions constitute the bulk of this suit as follows:

| | |
|---|---|
| Supplies accounts purchased | $118,581.56 |
| DuPont accounts guaranteed | 127,710.71 |
| | $246,292.27. |

---

Thus, the primary problem is the determination of the issue of preference in these two categories. The case was extensively tried non-jury. Prior to trial there was considerable discovery and stipulation in an effort to reduce the complexity of so many transactions and to narrow the issues as much as possible. Considering the substantial activity of factors in today's economy and while counsel on both sides ably prepared and presented the case, there is a surprising dearth of specific authority on the questions presented.

At the outset it was conceded that all of the prima facie elements [7] of a preferential transfer were present save (1) insolvency and (2) reasonable cause to believe insolvency; and if the Trustee carried the burden of proof on these two issues the payments would constitute preferences unless some matter of defense prevented such conclusion. The primary defenses presented were (1) the right of set-off under Section 68 of the Bankruptcy Act (11 U.S.C.A. § 108) and (2) the secured position of Heller by virtue of open-end clauses and cross-collateralization provisions of its factoring agreements and mortgages.

## FINDINGS OF FACT

On March 18, 1964, Bemporad Carpet Mills, Inc., filed a voluntary petition in bankruptcy in the United States District Court for the Northern District of Georgia, Rome Division, and was on said date adjudicated a bankrupt.

The four month period immediately preceding the date of bankruptcy extends from November 19, 1963, to March 18, 1964.

(1) "You are authorized to make payments due on our accounts payable from the proceeds of our factored sales.

This procedure will be of great assistance to us, and we trust that it will not greatly complicate the transactions with your company."

(2) "In connection with the chattel mortgage payments due by us, you are authorized to make these payments from the proceeds of our factored sales, and the payments made on October 14th of $5,500.00 each are specifically approved.

You are also authorized from time to time to make payments on the equipment note in the amount of $1,610.66, and two payments you recently made in this fashion are approved.

Your assistance in handling these transactions in the manner authorized above is greatly appreciated, and we hope that this does not cause you any inconvenience."

7. See Mayo v. Pioneer Bank & Trust Co., 5 Cir., 270 F.2d 823; 8A C.J.S. Bankruptcy § 213 at page 4.

On June 30, 1963, the balance sheet of Bemporad and statement of operations for the fiscal year ending on that date showed an insolvent position of $106,778. and an operating loss of $358,742., and the company was in fact insolvent on that date. On December 14, 1963, according to its statement Bemporad was insolvent by $581,437. As of November 16, 1963, Bemporad was insolvent by at least $500,000. Even if the highest market value of the fixed assets of the corporation, such as realty and machinery, are used instead of the cost-less-depreciation figures used on the June 30 and December 14 statements, Bemporad was insolvent on November 16, 1963, by at least $200,000.

Heller concedes that it had reasonable cause to believe insolvency as of January 9, 1964, when its officers reviewed the December 14th statement with other creditors.

From the beginning of the four month period on November 19, 1963, to the date of the first charge that was made against the Bemporad account on December 9, and up to January 9, 1964, Heller had reasonable cause to believe that Bemporad was insolvent, by reason of the following:

The financial arrangements under which Bemporad came out of the Chapter X proceedings in November, 1962, were the personal creation of Thomas E. Neal, senior Vice-President of Heller, who was familiar with the financial condition and operations of Bemporad prior to that time and continuously after that time. In fact, he recommended the hiring of Ross Allen, President of Bemporad and its chief executive officer from the time of reorganization until bankruptcy. Neal is very knowledgeable in the financial end of carpet manufacturing and also in marketing, and for the year preceding the four-months period he knew as much or more than management regarding Bemporad's true financial condition and prospects.

In April of 1963, Heller knew that DuPont refused to extend any credit to Bemporad due to Bemporad's poor financial condition.

Heller knew in September of 1963 that none of the suppliers factored by it would ship merchandise to Bemporad without first calling Heller and obtaining a guarantee of payment.

Eight times during 1963, for the months of May through December, Bemporad was past due in paying the Heller real estate note.

Ten times during 1963, for the months of March through December, Bemporad was past due in paying the Heller supertufter note.

On July 1, 1963, Heller advised Bemporad by letter that the June payments on the two mortgage notes were past due; and on July 10, 1963, Heller advised Bemporad by letter that payments owing to Heller on certain Pharr Yarns invoices were past due.

On September 3, 1963, Heller was notified that a $10,000. check issued to Heller by Bemporad had been dishonored by the drawee bank because of insufficient funds.

Two days later, on September 5, 1963, Thomas E. Neal, senior vice-president of Heller, and Ross Allen, president of Bemporad, entered into an agreement whereby Bemporad authorized Heller to pay DuPont and to immediately charge such payment against the Bemporad account and to also charge this account for indebtedness due to Heller on the various collateral notes.

On September 6, 1963, Heller received the Bemporad balance sheet and statement of operations for the fiscal year ending June 30, 1963, which was certified by a firm of certified public accountants as presenting fairly the financial position of Bemporad and which showed an insolvency.

The monthly interest payments due on the real estate note for October, November and December of 1963 were not paid until January 13, 1964, although due on the 13th day of each month.

Heller and Bemporad had been engaged in a close business relationship for a period of one year (November, 1962 to November, 1963), Heller had a total debt of $594,605.41 owed to it by Bemporad as of November 18, 1963, and Heller had full opportunity to obtain knowledge of Bemporad's financial condition.

In July of 1963 Thomas E. Neal prepared a memorandum which set forth his opinion that Bemporad "will suffer further losses" because of the company's merchandising policy.

Neal knew of the poor volume production of Bemporad in the spring of 1963. Neal and Allen had frequent telephone and personal conferences about the overall financial condition of Bemporad prior to the four-months period and Neal knew from the receivables purchased by Heller that sales were poor, considering the size of Bemporad.

Initially (November, 1962), payments to suppliers and DuPont were made direct by Bemporad either with its own funds or funds advanced by Heller to it for that purpose. Later, they were paid by Heller with funds furnished it by Bemporad.

In the early fall of 1963, when Bemporad's financial position became more critical, agreements were entered into whereby the suppliers and DuPont were paid by Heller and such payments immediately charged to Bemporad's account current, instead of awaiting a check to Heller from Bemporad.

On each day during the four months period, the total value of the outstanding accounts receivable purchased by Heller and of the collateral, upon which Heller had a lien and security interest, exceeded the total indebtedness of every kind owing from Bemporad to Heller on that day. On December 10, 1963, the total indebtedness owing by Bemporad to Heller was overstated on the books and records of Heller by $43,780.44 because of a one day delay in posting a part of the entries pertaining to supplier payments.

In January, 1964, after receipt of the December 14, 1963, statement, a meeting was arranged in Chicago by Heller and attended by various representatives of Bemporad's major creditors, including unsecured creditors such as Allied Chemical. At the meeting Neal gave the opinion that Bemporad would go under unless steps were made to rescue the operation. As part of the proposal, Heller agreed to furnish additional working capital by the purchase from Bemporad of certain substandard accounts which it had heretofore been unwilling to purchase. Under the original factoring agreement, Heller purchased accounts receivable without recourse and immediately became obligated to pay a purchase price equal to the face of the accounts receivable, less minor adjustments. Heller assumed the credit risk on such accounts and had no recourse against Bemporad except for breach of warranties by Bemporad that there were no disputes or counterclaims by its customers. In effect, the account current was subject only to such "disputations."

In January, 1964, the substandard accounts were purchased with recourse and the entire credit and collection risk of such accounts was on Bemporad. As a bookkeeping expedient such accounts were maintained as the "S account" by Heller. The "S" accounts were scheduled and assigned to Heller on the same form of schedule and under the same factoring agreement as the regular accounts. The acquisitions by Heller of "S" accounts were posted on a separate ledger but Heller's advances on the "S" accounts were not segregated from advances on the regular account and were posted only to the regular account ledger.[8] On March

8. The trustee places great emphasis on this separate account, contending that credits for advances thereon were not posted to the "S" account.

As some $33,721.16 of the substandard accounts were collected by Heller, the

Trustee contends that the debtor is due such additional sum in this suit. However, the evidence shows that credits for all such accounts ($74,376.05) were posted to the regular account current, and charged back for the $41,224.59 not col-

10, 1964, the "S" account ledger showing a balance of $67,711.77 was consolidated with the regular account ledger. Heller collected $33,151.46 on the "S" accounts. The remaining uncollected accounts totaling $41,224.59 were, during the course of liquidation, charged against Bemporad since Heller had previously given Bemporad full credit of $74,376.05 for the total amount of all "S" accounts acquired.

The indebtedness owing by Bemporad to Heller outstanding on the date of bankruptcy has been paid in full through the liquidation by Heller to its collateral and accounts receivable. After the commencement of the Bemporad bankruptcy proceeding, upon the authority of the Referee in Bankruptcy, Heller foreclosed its liens and security interests upon all real estate and equipment in a commercially reasonable manner and sold such collateral for $500,000. After giving Bemporad due credit for all the proceeds of liquidation there is now a final credit balance held by Heller of $12,714.31 which Heller has tendered to the Court for disposition.

In order to obtain payment of past-due interest on its real estate loan to Bemporad, Heller charged the Bemporad account as follows:

| Date Charged | Amount Charged | Interest Due Dates |
|---|---|---|
| January 13, 1964 | $ 9,302.04 | Oct., Nov. & Dec. 1963 |
| February 4, 1964 | 3,109.31 | Jan., 1964 |
| March 10, 1964 | 2,874.11 | Feb., 1964 |
| | $15,285.46 | |

and such charges are also attacked as preferences in addition to the main claims totaling $246,292.27.

## CONCLUSIONS OF LAW

As can be seen, the court has determined that the bankrupt was hopelessly insolvent during all of the period in question. In this connection, even under the "balance sheet" test, the bankrupt's actual, rather than threatened, condition at the time, determines the question of insolvency. Mitchell v. Investment Securities Corp., 67 F.2d 669(5) (5th Cir. 1933).

Under the rules applicable in this circuit, the question of reasonable cause is to be determined by the facts in each case. Thus, "Cases on the point have evolved a fine line to apply in determining whether a creditor has 'reasonable cause to believe' that a debtor is insolvent. For reasonable cause to exist, it is not necessary that a person benefitted by a transfer know positively that the result of the transaction will be to effect a preference: it is sufficient for a finding of reasonable cause that the person or his agent has knowledge of such facts as would induce a person of reasonable prudence to make inquiry, when such inquiry would have developed the facts essential to a knowledge of the situation. On the other hand, if the known facts should raise only a suspicion that the debtor might be insolvent, the test is not met. Compare Marks v. Goodyear Rubber Sundries, 2 Cir., 1956, 238 F.2d 533, 62 A.L.R.2d 770 with Lang v. First National Bank in Houston, 5 Cir., 1954, 215 F.2d 118. See 3 Collier on Bankruptcy, § 60.53." Mayo v. Pi-

---

lected. For all practical purposes, there was only one customer with various debits and credits. Until bankruptcy, the recourse accounts were maintained separately for obvious accounting benefits.

As there was present consideration for the purchase of the $33,721.16, no preference arises here any more than from any other direct purchase of accounts receivable.

oneer Bank & Trust Company, 297 F.2d 392 at 394, 395 [1, 2] (5th Cir. 1961). See also Mizell v. Phillips, 240 F.2d 738 at 741(10) (5th Cir. 1957). Under the overwhelming evidence in this case, if indeed Heller did not have actual knowledge of insolvency, it was at least put on notice to make an ordinarily diligent inquiry which would certainly produce knowledge of the insolvency which existed. See Collins v. Bank of Titusville, 36 F.2d 482 (5th Cir. 1929). The fact that Heller considered itself "secured" diminishes in no way its need for diligence nor does it produce a different standard of reasonable cause from that of an "unsecured" creditor. See Clower v. First State Bank of San Diego, 5 Cir., 343 F.2d 808.

■ Accordingly, the question of preference is now reached directly. The doctrine of "set-off" is often considered as a question of "non-preference" of a particular fund rather than a strict technical accounting matter, with the result that the problem is frequently approached from both directions by the courts. Thus a determination of "non-preference" is sometimes called a "set-off", and vice-versa. Walker v. Wilkinson, 296 F. 850 (5th Cir. 1924). Also, in considering such questions, the court sits in equity and should exercise its discretion under all the facts and circumstances of each particular case. E.G. In re Rosenbaum Grain Corp., 103 F.2d 656 (7th Cir. 1939).

Considering the question in such light and omitting the question of security for the purpose, there is considerable basis for holding that the payments were not preferential or, in the alternative, entitled to set-off. It can be argued that there was a present consideration in that almost concurrently with the furnishing of assets (i. e. raw materials) to the bankrupt, payment was made to the supplier with the bankrupt's own funds. Mere delays in payment do not normally render the transfer of funds a payment on an antecedent debt. The purchases of raw materials by the bankrupt were in essence cash transactions, with a delay occasioned only by furnishing the payment through Heller. 8A C.J.S. 220(1) at page 100. Engstrom v. Wiley, 191 F.2d 684 (9th Cir. 1951). The court has a duty to consider whether the parties' intention was to make a cash sale or an extension of credit. Unquestionably during the four-months period the suppliers would not extend credit to Bemporad, nor would they ship until Heller assumed the payment of the invoices. Thus, in equity, there is considerable basis to conclude that there was no antecedent debt; and, further, that no depletion of assets of the bankrupt occurred through the transfers of cash credits for raw materials received.

In wrestling with such problems, the courts have in similar cases reasoned that payments to third-parties on account of the debtor, such as the accounts payable purchased here, merely substitutes creditors and do not constitute preferences, and are subject to set-off by the payer. Thus, a stock-broker who held stock for a customer and grain accounts against him was allowed to set-off the debts as mutual even though not arising out of the same transaction. In re Rosenbaum Grain Corp., supra at (5). The endorser of a note of an insolvent debtor was allowed to set-off the amount of the note against a claim for services by the debtor against him. Abercrombie v. Brinkman, 293 F. 375 (4th Cir. 1923). The surety-company on a bond was allowed to set-off an insurance property damage claim against its bond liability. Hayden v. Standard Accident Insurance Co., 316 F.2d 598 (9th Cir. 1963). The situation is less clear where a person in the position of guarantor or surety, *without prior consent of the debtor*, uses funds or property of the debtor in his hands to satisfy a liability to another creditor. Miller v. Fisk Tire Co., 11 F.2d 301 (D.C. Minn.1926); Lytle v. Andrews, 34 F.2d 252 (8th Cir. 1929); Manufacturers Acceptance Corp. v. Hale, 65 F.2d 76 (6th Cir. 1933); Shapiro v. Royal Indemnity Co., 224 F.2d 89 (3rd Cir. 1955). In each of such instances, however, the application of funds without consent was

for an antecedent debt and depleted the assets of the estate available for other creditors. Here, as seen, Heller simply held debits and credits of accounts receivable and accounts payable of $118,-581.56 which it owned outright and was, in equity, entitled to set them off against the other.

By the provisions of Section 68 of the Bankruptcy Act (11 U.S.C.A. § 108), a creditor which has outstanding obligations to a bankrupt may set-off the obligation which the creditor owes to the bankrupt against claims which the bankrupt's trustee makes against the creditor. This privilege of allowing a creditor to so set-off an obligation owing from the creditor to the bankrupt has been recognized in American Bankruptcy law since 1800. 4 Collier, Bankruptcy ¶ 68.01 [1] at 703 (14th ed. 1964). Obviously, the use by a creditor of section 68 set-off, places that creditor in a preferred position with respect to other general creditors which are not indebted to the bankrupt estate. Nevertheless, this preferred treatment is expressly sanctioned by section 68 of the Bankruptcy Act. One leading bankruptcy treatise has characterized such a preference as a "legal preference," 3 Collier, Bankruptcy ¶ 60.15 at 827 (14th ed. 1964), and another while recognizing that set-off transaction "prefers" such a creditor categorically states that such a result has been repeatedly sanctioned by the courts. "There can be no serious doubt that a right of set-off in a debtor of the bankrupt who is also a creditor gives him an advantage over other creditors. If the debt due such debtor was paid by the bankrupt while insolvent and within four months of bankruptcy, the payment would ordinarily constitute a recoverable preference. By using the amount due as a set-off, the debtor-creditor gets the full benefit of it notwithstanding his debtor's insolvency. But this is immaterial. The equities are not against a set-off merely because of the fact of advantage to one who is a debtor, as well as a creditor, of the bankrupt." 3 Remington Bankruptcy ¶ 1434.5 at 376–77.

The purpose of section 68 "is to make it unnecessary for a creditor to pay the bankruptcy estate the full value of a claim he owes the bankrupt, while at the same time being allowed only partial satisfaction of a claim due him from the estate." United States v. Brunner, 282 F.2d 535, 537 (10th Cir. 1960).

As stated, there is less certainty regarding the DuPont accounts, where Heller's liability was technically contingent as guarantor. In point of fact, the transactions with DuPont were handled in almost the same fashion as the other suppliers, the only difference being that title did not pass and no factor's fee was collected from DuPont. The same arguments for "non-preference" and "set-off" could seemingly be advanced on the facts as in the case of the other suppliers. However, in view of what follows, an absolute determination of such question is not necessary.

It is concluded that, at all times under investigation, Heller was a secured creditor for all sums due it for the accounts payable and the guaranteed accounts, as well as for direct loans and interest due. The particular language of the various security instruments has been set out in these findings (See notes 1, 2, 3, 4 and 6). Suffice it to say, they are broad, whether they reach the judicial "dragnet" status or not. In bankruptcy matters, the determination of secured position and the rights thereunder are dependent on state law. Benedict v. Ratner, 268 U.S. 353, 45 S.Ct. 566, 69 L.Ed. 991.

Thus, it is possible for a security creditor under the same instrument to be in a favorable position in one state and in an unfavorable position in another, when it comes to bankruptcy of his debtor. Compare Hulsart v. Hooper, 274 F.2d 403 (5th Cir. 1960, Alabama) with James Talcott, Inc. v. Wilcox, 308 F.2d 546 (5th Cir. 1962, Florida). See also: Perkins v. Lakeport Nat'l Bank, 139 F.Supp. 898 (D.N.H.1955). The open-end clauses of the collateral notes and security deeds (Notes 1, 3, and 4) are clear. The actual assignment of the accounts receivable

does not specifically provide that they secure "any other indebtedness." However, the factoring agreement of November 16, 1962 (See note 2) and the letters of October 23, 1963 (See note 6) attached to the receivables assigned. Insofar as the four-months period is concerned, they were prior assignments of the account current and unequivocal direction to use such funds for the specific purposes of satisfaction of suppliers' accounts, the DuPont account, and any principal and interest payments due on the collateral notes.

■ There is little doubt that Georgia is a "creditor's state", and it falls in that group of jurisdictions which give the fullest effect to open-end clauses. Thus, the Georgia Supreme Court states: "In other words, it is a well established principle of law in this State that a grantor may convey property, real or personal, for the purpose of securing a present, past, or future indebtedness, this being a matter of private contract; and this court has previously said that courts should always guard with jealous care the rights of private contract, and give to them full effect when it is possible to do so. This is a duty which rests upon principles of highest importance, for the security and integrity of the business world depends upon it." Rose City Foods v. Bank of Thomas County, 207 Ga. 477 at 481, 62 S.E.2d 145 at 148. See also: Leffler Co. v. Lane, 146 Ga. 741, 92 S.E. 214; Hurst v. Flynn-Harris-Bullard Company, 166 Ga. 480, 143 S.E. 503. There is no question that the prior assignment under Georgia law extends to claims acquired from third parties. Rose City Foods v. Bank of Thomas County, supra; Vidalia Production Credit Assn. v. Durrence, 94 Ga.App. 368, 94 S.E.2d 609.

■ It is, therefore, concluded that the obligations of Bemporad to reimburse Heller for payments made and liabilities accrued pursuant to the guaranties and commitments issued by Heller to the suppliers were liabilities within the scope of the cross collateral future advance provisions contained in each of the security agreements, security deeds and bill of sale to secure debt executed by Bemporad and delivered to Heller, and the collateral subject to all such security instruments, duly and properly secured against the Trustee each such liability of Bemporad arising out of the guaranties and commitments issued by Heller from the time such guaranties and commitments were made by Heller. The giving of security by Bemporad to Heller prior to or concurrently with guaranties or commitments by Heller is not a preference under section 60 of the Bankruptcy Act. Trustee relies on Miller v. Fisk Tire Co., 11 F.2d 301 (D.Minn.1926); but in that case the collateral was given to the guarantor after the guaranty had been made.

Any finding of fact contained in these conclusions of law shall be deemed a finding of fact for all purposes.

Trustee is not entitled to recover from Heller and the costs of this action should be taxed against Trustee. Heller shall deposit with Trustee $12,714.31 for further disposition by the Referee in Bankruptcy.

There has been no contest here over the accounting by Heller of the funds in its hands or those obtained from foreclosure after bankruptcy, and this ruling, while controlling on the Referee on legal principles, shall in no way preclude on examination by him on the correctness of the charge-backs or the proper application of any funds by Heller, if they are contested.

■ While the result reached here is undoubtedly disappointing to the Trustee and to the general creditors of the bankrupt after their aggressive and thorough action, an opposite finding would make commonplace services offered to industry extremely hazardous to factors. Factoring services are a necessity to many businesses. To penalize by subsequent bankruptcy of the debtor a factor who carries out the good faith agreements of his customer would relegate the use of factors to those organizations so financially secure that they are not needed. Admittedly, there is some premium on dili-

gence by a creditor, but the purpose of the Bankruptcy Laws is not to equalize all creditors regardless of their priority, but only to preserve equality among creditors of the same class.

It is so ordered.