378 F.2d 734
 TUCSON HOUSE CONSTRUCTION COMPANY and Robert E. McKee General Contractor, Inc., Appellants.
v.
Walter E. FULFORD, as Trustee in Bankruptcy of Fike Plumbing & Heating Co., Inc., Appellee.
 No. 21184.
 United States Court of Appeals Ninth Circuit.
 May 11, 1967.
 
 1
 William F. Haug, T. Patrick Flood, Jennings, Strouss, Salmon & Trask, Phoenix, Ariz., for appellants.
 
 
 2
 Henry Jacobowitz, Phoenix, Ariz., for appellee.
 
 
 3
 Before JERTBERG and MERRILL, Circuit Judges, and MATHES, District Judge.
 
 MATHES, District Judge:
 
 4
 Tucson House Construction Company and Robert E. McKee General Contractor, Inc., hereafter called McKee, appeal from an order of the District Court confirming the referee's order, made in the exercise of consented-to summary jurisdiction, directing appellants to turn over $55,446.13 to the trustee in bankruptcy of Fike Plumbing & Heating Co., Inc., hereafter called Fike.
 
 
 5
 Appellants' principal contentions here is that the turnover order was erroneous because McKee was entitled, pursuant to § 68 of the Bankruptcy Act [11 U.S.C. § 108], to set off certain subrogated claims against bankrupt Fike under one subcontract against McKee's indebtedness to Fike under another subcontract.
 
 
 6
 Assuming for the purposes of this appeal the correctness of appellant's version of the controversy, the facts controlling decision are as follows: On August 6, 1962, Fike entered into a subcontract with general contractor McKee, whereby Fike agreed to perform certain plumbing work on an apartment building known as "Tucson House" then under construction in Tucson, Arizona. The Tucson House subcontract provided for retention by the general contractor of 10% of the moneys payable to subcontractor Fike until "30 days after completion and acceptance of subcontractor's work by the owners and receipt of final payment from the owners."
 
 
 7
 While engaged in the plumbing work on Tucson House, Fike entered another subcontract with general contractor McKee, whereby Fike agreed to perform plumbing work on the John C. Lincoln Hospital then under construction in Phoenix, Arizona. Both the Lincoln Hospital subcontract and the Tucson House subcontract contained the usual provisions that subcontractor Fike would pay for all labor and materials used by Fike on the job, and would indemnify general contractor McKee for all liability, damage, claims, and expenses, resulting directly or indirectly from performance of the subcontract.
 
 
 8
 As general contractor, McKee had contracted with Lincoln Hospital to pay all claims on the project, and had furnished a bond by which McKee and its surety became jointly and severally liable for all unpaid claims for labor and materials furnished on the job, including claims for labor and materials furnished to Fike under the plumbing subcontract. In turn, McKee required Fike to post a surety bond for faithful performance and payment of Fike's obligations under the plumbing subcontract.
 
 
 9
 On November 16, 1964, Fike defaulted on the Lincoln Hospital subcontract, and on the following day filed a voluntary petition in bankruptcy. McKee promptly called upon Fike's surety to complete the plumbing subcontract and to pay Fike's outstanding bills. Fike's surety agreed to complete the work called for by the subcontract, but refused to pay outstanding bills owing to Fike's laborers and materialmen. This refusal was based upon the claimed ground that general contractor McKee had an obligation, asserted to be enforceable by Fike's surety under Arizona law, to apply retained moneys owing to Fike on the Tucson House job toward payment of the claims of Fike's unpaid laborers and materialmen on the Lincoln Hospital job. [See Ariz.Rev.Stat. § 12-1641.]
 
 
 10
 We find no authority — and, other than the Arizona statute just cited, appellants have referred us to none — which purports to sustain the view of Fike's surety as to McKee's obligations under Arizona law. Section 12-1641 merely provides that a "surety * * * may require * * * the * * * obligee * * * to bring an action upon the contract" against the principal, and thus compel exoneration of the surety. [See Simpson on Suretyship § 42, at 178-179 (1950).] But even if this statute were otherwise applicable to the situation at bar, Arizona law could not affect ownership of the retained moneys on the Tucson House job, in the face of Fike's intervening bankruptcy.
 
 
 11
 Apparently convinced, nonetheless, of the correctness of the contentions of Fike's surety, or for some other reason not disclosed by the record, McKee thereupon entered into an agreement with Fike's surety to pay "such laborers and materialmen of Fike on the Lincoln Hospital project * * * as authorized in writing" by Fike's surety, with the understanding that all costs of ensuing litigation would be borne by Fike's surety.
 
 
 12
 McKee accordingly proceeded to pay $50,745.12 toward satisfaction of labor and material claims against Fike on the Lincoln Hospital subcontract; and it is significant that McKee did not pay all outstanding claims of Fike's laborers and materialmen on the Lincoln Hospital subcontract, but only enough to aggregate approximately the retained amount remaining unpaid by McKee to bankrupt Fike on the Tucson House subcontract.
 
 
 13
 McKee now contends that these post-bankruptcy payments are to be applied against McKee's indebtedness to Fike under the Tucson House subcontract because of the right of set-off accorded under § 68a of the Bankruptcy Act, which provides that:
 
 
 14
 "In all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid." [11 U.S.C. § 108a.]
 
 
 15
 In considering this asserted right of set-off under § 68a, the facts prompt us to turn at once to § 68b, which provides that:
 
 
 16
 "A set-off or counterclaim shall not be allowed in favor of any debtor of the bankrupt which * * * (2) was purchased by or transferred to him after the filing of the petition * *, with a view to such use and with knowledge or notice that such bankrupt was insolvent or had committed an act of bankruptcy." [11 U.S.C. § 108b.]
 
 
 17
 Assuming McKee's liability to Fike's unpaid laborers and materialmen on the Lincoln Hospital subcontract, under the provisions of McKee's general contract, as well as the provisions of McKee's performance and payment bond on the Lincoln Hospital job, this was at best a contingent liability; for under the facts at bar McKee would ordinarily have been able to assert a cross-claim or make third-party complaint requiring Fike's surety to pay any amounts for which McKee might be held liable to Fike's laborers and materialmen. [Cf. Fed.R.Civ.P. 13 (g), 14(a).]
 
 
 18
 McKee's contingent liability was, moreover, a remote one. Only in the event of financial inability of both Fike and Fike's surety to respond, would McKee ultimately become liable upon the claims of Fike's unpaid laborers and materialmen. [See, generally: Ariz.Rev. Stat. §§ 12-1641 — 12-1646; Prescott National Bank v. Head, 11 Ariz. 213, 90 P. 328 (1907); Pacific States Electric Co. v. United States Fidelity & Guaranty Co., 109 Cal.App. 691, 293 P. 812 (1930).] And there is not the slightest suggestion here that Fike's surety would have been financially unable at any time to honor its obligations under the terms of Fike's bond, or that the claims would have exceeded the penal sum of Fike's bond.
 
 
 19
 Nor is there evidence that any of Fike's unpaid laborers and materialmen on the Lincoln Hospital job had, prior to the agreement between McKee and Fike's surety, made demand upon McKee for payment of claims against bankrupt Fike. It is interesting to record, too, the candid admission of McKee's comptroller that he did not believe McKee had any "monetary interest" in the present litigation.
 
 
 20
 In effecting the post-bankruptcy arrangement with McKee, the obvious hope of Fike's surety was to enable McKee to set off the subrogated claims arising out of McKee's payment of Fike's unpaid laborers and materialmen on the Lincoln Hospital subcontract against McKee's retained indebtedness to Fike on the Tucson House contract. In this manner the ultimate liability of Fike's surety on the claims paid by McKee would be extinguished; whereas, but for McKee's payment, Fike's surety would be required to satisfy the unpaid claims of Fike's laborers and materialmen, and to seek reimbursement from Fike's bankrupt estate along with other general creditors.
 
 
 21
 In National Bank of Newport v. National Herkimer County Bank, 225 U.S. 178, 32 S.Ct. 633, 56 L.Ed. 1042 (1912), the endorser of a note made by the bankrupt reacquired the note by purchase shortly before bankruptcy of the maker, and asserted it as a set-off against the endorser's own indebtedness to the bankrupt. Although the precise question presented there was whether the endorsee had received a preference under § 60 of the Bankruptcy Act [11 U.S.C. § 96], the Court observed:
 
 
 22
 "* * * [A]s was said by the circuit court of appeals, `if the [endorser], knowing the [bankrupt] to be insolvent, acquired the note with a view to using it as a set-off or counterclaim against its debt, it could not legally do so, Bankruptcy Law, § 68b.' The amount of the indebtedness of the [endorser] could still be collected by the trustee." [225 U.S. at 185-186, 32 S.Ct. at 635, quoting from Mason v. National Herkimer County Bank, 172 F. 529, 531 (2nd Cir. 1909).]
 
 
 23
 It is true that § 68b has been held not to bar a § 68a set-off by guarantors who had paid creditors of the bankrupt pursuant to "bona fide guaranties made in the regular course of business which the defendants regularly discharged when they were required to do so" [Lowenthal v. Block, 175 Misc. 472, 474, 22 N.Y.S.2d 736, 738 (1940)]; and the mere fact that an endorser took up a matured note made by the bankrupt which was later used as a set-off has been held not to compel a finding that the matured note was reacquired "with a view of using it * * * as a set-off" [Wasserman v. Hollidge, 267 Mass. 460, 166 N.E. 843 (1929); see McLaughlin, Amendment of the Bankrupt Act, 40 Harv.L.Rev. 583, 603 (1927).] Moreover, this Court has held that a bankrupt's surety, who was required to satisfy a post-bankruptcy judgment obtained by the bankrupt's creditor in an action commenced against the surety and the bankrupt prior to bankruptcy, was entitled to set off the amount of the judgment against the surety's indebtedness to the bankrupt. [Hayden v. Standard Accident Ins. Co., 316 F. 2d 598 (9th Cir. 1963).]
 
 
 24
 Under the circumstances at bar, however, we hold that the voluntary payment by McKee of Fike's suppliers, resulting in McKee's subrogation to their rights against bankrupt Fike, constituted "a set-off or counterclaim" which was "purchased by or transferred to him * * * with a view to such use and with knowledge or notice that such bankrupt was insolvent", within the meaning of § 68b(2). [11 U.S.C. § 108b(2).] In our opinion, indeed, the facts make this a stronger case for the application of § 68b(2) than was presented in National Bank of Newport v. National Herkimer County Bank, supra, 225 U.S. at 185-186, 32 S.Ct. 633. [See also: Shapiro v. Royal Indemnity Co., 224 F.2d 89 (3rd Cir. 1955); Shaw v. Walter E. Heller & Co., 258 F.Supp. 394, 402-403 (N.D. Ga.1966).]
 
 
 25
 This holding is buttressed by the incontrovertible fact that here "there is no good explanation for * * * [McKee's] acquisition of a claim against the bankrupt except the design to get the benefit of a set-off". [McLaughlin, supra, 40 Harv.L.Rev. at 603; see Lowenthal v. Block, supra, 175 Misc. at 474, 22 N.Y.S.2d at 738.] That McKee was contingently liable to Fike's suppliers on the Lincoln Hospital job, and consequently had a contingent subrogated claim against Fike at the time of Bankruptcy, cannot alter the circumstance that the contingency was in fact a remote one, and that in all reasonable probability McKee's contingent subrogated claim — here sought to be used as a set-off — would never have come into being, if McKee had not in effect assumed the role of a volunteer and officiously paid Fike's suppliers after bankruptcy.
 
 
 26
 Our holding is further reinforced by the consideration that § 68 of the Bankruptcy Act [11 U.S.C. § 108] is permissive, rather than mandatory, and is to be applied by the courts of bankruptcy in the exercise of discretion consistent with general principles of equity. [See: Cumberland Glass Mfg. Co. v. DeWitt, 237 U.S. 447, 35 S.Ct. 636, 59 L.Ed. 1042 (1915); Gray v. Rollo, 85 U.S. (18 Wall.) 629, 21 L.Ed. 927 (1874); First National Bank of Portland v. Dudley, 231 F.2d 396 (9th Cir. 1956); In re Yale Express System, Inc., 251 F.Supp. 447 (S.D.N.Y.1965), vacated on other grounds, 362 F.2d 111 (2nd Cir. 1966); see, e. g.: Abercrombie v. Brinkman, 293 F. 375 (4th Cir. 1923); In re Garfunkel, 8 F.2d 790 (S.D.N.Y.1924).]
 
 
 27
 To permit a set-off pursuant to § 68a necessarily results in a preference — a "lawful preference". [In re Pottier & Stymus Co., 262 F. 955, 956 (2nd Cir. 1919); see 3 Collier, Bankruptcy ¶ 60.15 (14th ed. 1964); compare National Bank of Newport v. National Herkimer County Bank, supra, 225 U.S. 178, 32 S.Ct. 633, and Miller v. Fisk Tire Co., 11 F.2d 301 (D.Minn.1926), with Shapiro v. Royal Indemnity Co., supra, 224 F.2d 89.] It is enough to sanction such a preference when the claim used as a set-off has been acquired as a result of a direct legal obligation. But in our view it would be grossly inequitable to permit the set-off where, as here, the claim sought to be used was in effect deliberately "manufactured" for that purpose. It is hardly necessary to add that we view the District Court's order confirming the referee's action as an exercise of sound discretion.
 
 
 28
 The decision just announced makes it unnecessary to pass upon the remaining issues which relate to the claimed set-off, such as the trustee's contention that the general contractor for Tucson House was not the same legal entity as the general contractor for Lincoln Hospital.
 
 
 29
 The holding of the District Court as to appellants' liability to the trustee for attorneys' fees is correct and the finding as to the amount of attorneys' fees recoverable by the trustee is not clearly erroneous, and hence is affirmed.
 
 
 30
 The award of interest from January 11, 1965, being thirty days after receipt by the general contractor of final payment on the Tucson House, is in accordance with the provisions of the Fike sub-contract; and the implied finding that interest accrued from that date, despite Fike's contingent liability under the one-year warranty provision, will not be disturbed.
 
 
 31
 For the reasons stated, the order of the District Court confirming the referee's order is affirmed. However, since appellants' contentions as to Fike's one-year warranty obligations, which allegedly ripened subsequent to the hearing before the referee, were not presented to the District Court, those issues will be remanded for further proceedings not inconsistent with this opinion.